No. 20,283.

INDUSTRIAL COMMISSION OF COLORADO, ET AL., *v.*
WANDA PETERSON, ET AL.
(377 P. [2d] 542)

Decided December 24, 1962.     Rehearing denied January 21, 1963.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK
E. HICKEY, Deputy, Mr. PETER L. DYE, Assistant, for
plaintiff in error Industrial Commission of Colorado.

Mr. HAROLD CLARK THOMPSON, Mr. LOUIS SCHIFF, Mr.
ALIOUS ROCKETT, Mr. FRED B. DUDLEY, Mr. FRANCIS L.
BURY, for plaintiffs in error State Compensation Fund
and Carl Robinson.

Messrs. MYRICK, SMITH & CRISWELL, Mr. JOSEPH W.
ESCH, for defendants in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THE presumption against suicide is strongly held in the law and the question of what evidence is necessary to overcome it is the crux of this action. In other words, did Virgil H. Peterson, a twenty-four year old filling station attendant, commit suicide or die of carbon monoxide poisoning involuntarily during and at his place of employment on November 6, 1960? Both the referee and the Industrial Commissioner found that Peterson had committed suicide. The district court reversed this finding and ordered an award to be made to the widow and children who are defendants in error here.

We believe that there is substantial evidence, which will be detailed more fully hereafter, sufficient to support the inference logically following therefrom that Peterson committed suicide and that it supports the denial of the award by both the referee and the Industrial Commission. It follows, therefore, that the order of the district court in setting aside the commission order was error.

Rather than attempt to summarize the evidence presented to the referee, we quote liberally from his order which is an accurate and fairly comprehensive recital of the evidentiary matters before him. Before quoting therefrom, however, it is believed helpful to note the statute with which we are here concerned. C.R.S. '53, 81-13-2, provides, in part, as follows:

"The right to the compensation provided for in this chapter * * * shall obtain in all cases where the following conditions occur:

" * * * (3) where the injury or death is proximately caused by accident arising out of and in the course of his employment, and is not intentionally self-inflicted."

Paraphrasing this statute, was Peterson's death caused "by an accident arising out of and in the course of his

employment" and was it "not intentionally self-inflicted?" The referee found and concluded as follows:

"That decedent had been employed by respondent employer in a capacity of relief petroleum station attendant for a period of approximately two months at the time of his unfortunate demise. Prior to this period of time decedent had worked at various periods for respondent, who found him to be a highly competent station attendant, well versed in the techniques necessary to efficiently operate a filling station. There was no hesitancy on the part of the respondent employer in allowing decedent to have sole control of the station during the graveyard shift, beginning 11:00 p.m. and ending the following day at 7:00 a.m. On the evening of November 5, 1960, decedent reported to work at the usual time.

"On the following morning at approximately 4:10 a.m. claimant telephoned the station manager and requested that he arrive at the premises for the morning shift a little bit early because he was feeling unwell. The manager offered to come to the station immediately but was assured by decedent that if he would appear only slightly early it would be sufficient. At approximately 6:00 a.m. the station manager walked from his home to the station about one block away * * *. As he crossed the driveway he noted that the interior of the station was completely obscured with what he at that time thought was steam raised by the decedent washing the station floor with hot water on a cold morning. He opened the door and went into the repair "bays" where a late model vehicle was standing with its engine running. He almost immediately noted decedent's legs protruding from an open door of the car. He attempted to arouse this person and when unable to do so, turned off the ignition key, only to discover that an older model vehicle sitting in the next "bay" also had its engine operating. He immediately became aware that there was a lethal amount

of carbon monoxide in the air and hastily opened all doors. Before opening the doors, he noted that every doorway to the outside was locked.

"Testimony was offered by decedent's brother and by his sister-in-law who had visited him between the hours of 11:00 p.m. and 1:30 a.m. for the purpose of procuring a state inspection certificate for their vehicle. At that time he was in gay spirits and talked extensively of having his army medical examination within the next week. He ate two sandwiches which were procured by his brother and brewed a pot of coffee which they drank while cheerfully conversing. No hint of despondency was noted by either of these persons during the time they were with decedent.

"On the evening before he reported for work he had an extended conversation with his mother and discussed many impending plans, which did not indicate he was in any wise despondent. Decedent had been separated from his wife and three small children for nearly one year but had talked with them from time to time and had visited his wife with apparent intention of striving to reconcile their marital difficulties, shortly before his death.

"The manager testified that it was customary for the night station attendants to lock one of the doors entering upon the premises where they were not located during their work shift in order to prevent an assailant from sneaking in behind them. He said, however, that it was customary for the attendants to leave the door unlocked to the area in which they were located at any particular time in order that customers might enter the premises. Respondent employer testified he had called from time to time during night shifts when decedent was working to pick up excess receipts and that he had never found the doors to be locked.

"The newer model vehicle had been left at the station on the previous evening for a grease job, washing, and

to have anti-freeze added to the radiator. At the time decedent's brother was in the repair "bay" he was of the opinion that this latter model vehicle had been washed. On the following morning when decedent was found in this vehicle, it was discovered that the vacuum cleaner had been moved to the vicinity of the car and that the hose was lying in the interior of the vehicle. The work ticket was precise in noting that one quart of anti-freeze was to be added to the contents of the radiator. There was no apparent reason from anything appearing upon the work sheet to account for operation of the vehicle's motor. It is noted that it is customary to warm the contents of the vehicle's radiator and cooling system in order to test the content to see how much antifreeze should be added. In this case, however, it was indicated a precise amount was to be added, thus connoting a previous testing to determine the amount or lack of necessity to make such test.

"The older model vehicle had apparently been received by decedent to have its battery charged. The electrodes were fixed to the battery machine and there was no purpose for operating the motor of this vehicle, since it would not charge the battery faster nor in any way assist in this operation.

"* * *

"From this evidence, the Referee finds that decedent in spite of the legal presumption against a person taking his life, did design to do so, and that his death is not the result of an inadvertent accident.

"IT IS, THEREFORE, ORDERED: That claimant's claim for compensation be and the same is hereby denied."

■ In *Preferred Acc. Ins. Co. v. Fielding*, 35 Colo. 19, 83 Pac. 1013 (1905), a gunshot death case, it was said that: "When death by unexplained violent external means is established the law does not presume suicide or murder; it does not presume that injuries are inflicted

intentionally by the deceased or by some third person; * * * ." And, in *Hershey v. Agnew,* 83 Colo. 89, 262 Pac. 526 (1927), which involved a suit on an accident policy for the death of the insured from burns which evidently were due to external self applied medicines, it was stated: "The general and natural presumption is against suicide. This presumption must stand until overcome by testimony which shall outweigh the presumption."

58 Am. Jur. 857, *Workmen's Compensation,* Sec. 436, states:

"The well-known rule that suicide will not be presumed, and that as between accident and suicide the law supposes accident, has been applied in a number of cases arising under compensation statutes. *This, however, is a rebuttable presumption and it does not control where there is substantial proof from which the conclusion of suicide may be reached by rational consideration."* (Emphasis supplied.)

In considering the above presumption it must be remembered that " * * * where the right to compensation is dependent upon the existence of the element of accident as a causation factor, the claimant must prove that the injury or disability resulted from an accident * * * ." 58 Am. Jur., supra.

What we have here then is a case where these claimants had the burden of proving that the death resulted from an accident. In this they are aided by the presumption that Peterson did not commit suicide. If evidence was introduced that overcame the presumption, then claimants still had the burden of proving that the death resulted from an accident. Does this record show substantial evidence to overcome the presumption? And, is there evidence to support the inference drawn by the referee and commission that Peterson had knowingly taken his life? We believe it does. Let us examine the pertinent facts.

Peterson was an experienced and responsible filling

station attendant who could not help but know the physical effects of being in a closed room with two car motors running. If closed doors were not enough there is also the fact that all the outside doors to the station were locked. The evidence is also that the newer car had already been washed and that a fixed quantity of antifreeze was to be added to its radiator, thus no reason appears why its motor was running. As to the older vehicle even less reason appears for its motor to be running. It logically and normally would be shut off while its battery was being charged. Its motor, therefore, must have been running for another purpose which logically leads to the inference that the newer vehicle's motor was running for the same purpose. When considered, in the chronological sequence of events, that Peterson called his manager and indicated he was not feeling well and declined immediate aid but did want "help" in two hours, it may be inferred that this was part of his plan and not merely notice of an unimportant illness. One normally would not disturb his employer at 4 a.m. unless he needed immediate assistance or was doing it as part of a preconceived plan to accomplish some other purpose.

The evidence to be weighed against the above is that of relatives that Peterson was cheerful the evening before and had discussed future plans with them. These plans, however, disclose that he had had domestic difficulties but soon hoped for a reconciliation, and, that he might soon have to enter upon army service. The points as to domestic problems and military service can as logically point to tensions and a possible desire to commit suicide as to bright hopes for the future. Peterson's cheerfulness before his death could either have been real or feigned as part of a plan. All these facts, however, when considered along with the direct events leading to the death can lead logically and reasonably to a conclusion that Peterson did in fact have a plan to die and carried it out.

██ Once there appears substantial evidence, as here,

to overcome the presumption against suicide it was for the referee and the commission to weigh all the evidence and to draw reasonable inferences therefrom. Their logical conclusions based upon adequate support in the record should not be disturbed by the courts. In other words, even though there is no material conflict in the evidence, courts should not interfere with such findings where conflicting inferences can be drawn from the evidence as where honest and reasonable individuals might well disagree.

The applicable rule is well stated in *Claimants in the Matter of the Death of Leo W. Bennett v. Durango Furniture Mart and Ind. Comm. of Colorado, et al.,* 136 Colo. 529, 319 P. (2d) 494 (1957), where it was said:

"We are definitely of the opinion that the record here discloses a situation where conflicting inferences to be drawn from the facts submitted were peculiarly within the province of the Referee and the Commission and having determined them adversely to claimants, there being no question of misapprehension of the law to such facts, the courts may not interfere."

The judgment is reversed and the cause remanded with directions to affirm the order of the commission.

MR. JUSTICE FRANTZ and MR. JUSTICE MCWILLIAMS dissent.

MR. JUSTICE MCWILLIAMS dissenting:

I must respectfully dissent.

This is a close case on the question of how much evidence it takes to overcome the presumption against suicide. The fact that the case is characterized as "close," however, does not mean that the finding of the Commission that Peterson committed suicide is necessarily to be approved. Rather, it makes our task all the more delicate and difficult.

In my judgment the majority has fallen into the same

error as did the Commission, namely, it has failed to give *proper* recognition to the long-standing presumption against suicide. In the case of a violent, but non-homicidal, death, the law presumes it not to be suicide, and supposes such to have been an accident. This presumption is admittedly not conclusive, but is rebuttable. Just what is the quantum of evidence necessary to rebut and overcome the presumption against suicide? The authorities agree that suicide need not be established "beyond a reasonable doubt." But it is also agreed that it is something more than a mere "preponderance of the evidence." The quantum of evidence legally sufficient to overcome the presumption against suicide has been variously described as "substantial," "clear," and "positive," and, conversely, it has been said that a finding of suicide cannot rest on "guess," "speculation," "supposition," or "conjecture." See 58 Am. Jur., p. 857, and 100 C.J.S., p. 768. Particularly is this true, where, as here, all of the evidence as to suicide is circumstantial. So in 36 A.L.R., p. 398, it was said:

"The concensus of opinion, however, is that when circumstantial evidence is relied upon to establish suicide, the party striving to prove same must prove it by facts excluding every reasonable hypothesis of natural or accidental death."

Before briefly setting forth my analysis of the evidence surrounding Peterson's death, it is well to keep in mind the rule laid down in *Ross-Lewin v. Germania Life Ins. Co.*, 20 Colo. App. 262, 78 Pac. 305:

"The presumptions are against suicide; and if a death which may be explained on the theory of suicide, is also explainable on another theory which excludes the supposition of self-murder, in the absence of evidence to the contrary, the law will adopt the latter hypothesis."

Is the circumstantial evidence in the instant case of sufficient quality and quantity to overcome the presumption against suicide? Is the evidence of suicide

clear and convincing? I hold that as a matter of law it is not. The majority holds that it is. Therein lies our area of disagreement.

The majority opines that Peterson *"could not help but know* the physical effects of being in a closed room with two car motors running." (Emphasis supplied.) In this respect it should be noted that the case is not one where an automobile with its motor running has been found in some odd or strange place. Rather, we are concerned with a filling station which has a "3 bay" garage attached. I remain singularly unconvinced that the mere fact that an automobile is found with its motor running in a closed, commercial garage in cold weather is clear and convincing proof that an attendant employed in servicing such automobile permitted its motor to run with suicidal intent. The fact that two automobiles had their motors running does not alter my view. Indeed, Peterson's supervisor was actually unable to detect that two were running until he turned the one off. In this connection, the majority declines to recognize that there was a very logical reason why at least one of the cars had its motor running. The evidence was undisputed that to properly test a radiator for anti-freeze it was necessary to run the motor to heat the cooling fluid to a proper temperature for testing, and one of the cars was in the garage for the purpose of adding anti-freeze.

The two doors of the station were locked, ergo, says the majority, suicidal intent. This is deemed to be logical and rational even though it was undisputably established that Peterson, who worked the graveyard shift by himself, was apprehensive of a burglary or robbery and on the very night in question was actually carrying in his hip pocket a wrench to protect himself in the event of a surprise attack.

Continuing, the majority states, "The points as to domestic problems and military service can as logically point to tensions and *a possible desire to commit suicide*

*as to* bright hopes for the future." (Emphasis supplied.) In my view there is absolutely nothing in the record to justify the inference that Peterson had personal problems of such complexity and enormity as to drive him to intentional self-destruction. In fact, the evidence on this issue is to the contrary.

Also, the undisputed evidence before the Commission shows that at the precise moment Peterson lost consciousness he was in the act of vacuuming the interior of an automobile. Just how this rationally fits into a suicidal pattern has not yet been explained.

In short, the evidence of suicide in my judgment is at most speculative, and certainly not clear and convincing. The finding of the Commission is based on supposition, surmise and guess work. The evidence being as compatible with a hypothesis of accident as suicide, the presumption against suicide carries the day.

I am authorized to say that MR. JUSTICE FRANTZ joins in this dissent.