JOHN HARPER AND CONSTANCE HARPER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4588–67. Filed May 26, 1970.

*Isidore R. Tucker*, for the petitioners.
*William F. Chapman*, for the respondent.

## I. *Use of Bank-Deposits Method*

Petitioners contend that respondent's use of the bank deposits-expenditures method of reconstructing their taxable income was arbitrary and unreasonable, and thus shifts to respondent the burden of proving the correct amount of the deficiencies for the years in question. *Helvering* v. *Taylor,* 293 U.S. 507 (1935).

It is clear that petitioners' records were incomplete and inadequate, and that they kept no books of account. In the absence of adequate records, an examination conducted by respondent's agents disclosed that petitioners had sources of income and that they made substantial bank deposits during the years 1957 through 1960. In our opinion respondent was justified in determining petitioners' taxable income by using the bank-deposits method. Where a taxpayer has made numerous deposits in bank accounts, the sources or nature of which are not accounted for or recorded in books and records maintained by him, determinations made by the Commissioner of income subject to tax on the basis of such deposits have been approved in many instances; and it has been repeatedly held that a presumption of correctness attaches to such determinations and that the taxpayer has the burden of overcoming such presumption. See sec. 446(b), I.R.C. 1954; *Marcello v. Commissioner*, 380 F. 2d 494 (C.A. 5, 1967) ; *Estate of Robert Lyons Hague*, 45 B.T.A. 104, 109, affd. 132 F. 2d 775, 776 (C.A. 2, 1943), certiorari denied 318 U.S. 787; *Thomas B. Jones*, 29 T.C. 601, 613–614 (1957); *Hoefle v. Commissioner*, 114 F. 2d 713, 714 (C.A. 6, 1940) ; *Boyett v. Commissioner*, 204 F. 2d 205, 208 (C.A. 5, 1953) ; *Goe v. Commissioner*, 198 F. 2d 851, 853 (C.A. 3, 1952) ; *Doll v. Glenn*, 231 F. 2d 186, 188 (C.A. 6, 1956) ; *O'Dwyer v. Commissioner*, 266 F. 2d 575, 588 (C.A. 4, 1959), affirming 28 T.C. 698 (1957), certiorari denied 361 U.S. 862. Use of the bank-deposits method is proper even when the taxpayer keeps books and records which support his return as filed. *Campbell v. Guetersloh*, 287 F. 2d 878 (C.A. 5, 1961). Respondent is not bound to accept a taxpayer's return or his books at face value. *Holland v. United States*, 348 U.S. 121 (1954). And, contrary to petitioners' spurious argument, use of the bank-deposits method does not require the establishment of a beginning net worth.

Several memorandum opinions of this Court which are cited in petitioners' brief are not in point. Each is distinguishable on its facts.

Although respondent made some errors in applying the bank deposits-expenditures method, his determination was far from arbitrary. "The fact that the Commissioner's determination was not completely correct does not invalidate the method employed." *Marcello v. Commissioner, supra* at 497. As our findings of fact reflect, we view this as a case in which it is particularly appropriate to place the burden upon the petitioners to show that their unexplained bank deposits did not in fact represent taxable income. Yet we find the testimony of Constance Harper (John did not testify) vague, confusing, and sometimes unconvincing and unworthy of belief. Certainly it does not support her sweeping assertions that the bank deposits, which were otherwise unaccounted for, did not constitute taxable income.

II. *Inapplicability of Miranda Decision to Noncustodial Interviews in Civil Tax Fraud Cases*

During her interview with Revenue Agents Tryforos and Woulfowitz on June 28, 1961, Constance Harper stated that she had no dividend income, that she had received no inheritances, and that she had no sources of income other than her rental properties. She now urges us, on the authority of *Escobedo* v. *Illinois*, 378 U.S. 478 (1964), and *Miranda* v. *Arizona*, 384 U.S. 436 (1966), either to exclude evidence of these statements or to accord them little or no weight. Petitioner's arguments on this point depend on two propositions: (1) That *Escobedo* and *Miranda* apply to certain noncustody situations, and (2) that the rationale of those criminal cases extends to civil tax fraud proceedings. We conclude herein, contrary to her view, that *Miranda* warnings were not required because (1) this was a noncustodial, noncoercive interview and (2) that statements made by petitioner to the revenue agents are admissible without such warnings in this civil case.

We have found that petitioner's statements were made voluntarily in response to the agents' questions, and that she appeared neither frightened nor confused during the interview. We have also found that Tryforos was a member of the Manhattan "fraud squad" and that he contemplated the possibility of criminal fraud proceedings at the time of the interview. Thus we reject respondent's argument that Tryforos "was not investigating her for fraud." The nature of the questions posed at the interview indicate that Tryforos had previously investigated petitioner's bank deposits, and that he sought some explanation of them. When, as might be expected, no satisfactory explanation was given by the petitioner, Tryforos recommended that the case be referred to the Intelligence Division. In these circumstances it is not significant that Tryforos was a revenue agent rather than a special agent. See *Mathis* v. *United States*, 391 U.S. 1 (1967).

### A. Noncustodial Interrogation

In *Miranda* v. *Arizona*, *supra*, the Supreme Court held that the Government may not use statements stemming from custodial interrogation of the defendant in a criminal case unless it has first warned him fully of his constitutional rights under the fifth amendment[2] of the Constitution, including the right to counsel[3] as required by *Escobedo* v. *Illinois*, *supra*. It is plain that the *Miranda* decision was

---

[2] The fifth amendment of the Constitution of the United States provides:

"No person * * * shall be compelled in any criminal case to be a witness against himself, * * *"

[3] The sixth amendment of the Constitution of the United States provides:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

intended to apply only to the interrogation of a suspect then in custody and to prevent coercion by interrogators when a suspect is "otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Although the dissenters thought that the opinion was capable of an expansive interpretation,[4] the majority carefully specified the perimeter of its *Miranda* rule, as indicated in the following statements:

More specifically, we deal with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself. [384 U.S. at 439]

\* \* \* \* \* \* \*

Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way [384 U.S. at 444]

\* \* \* \* \* \* \*

The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. \* \* \* [384 U.S. at 445]

\* \* \* \* \* \* \*

The question in these cases is whether the privilege is fully applicable during a period of custodial interrogation. \* \* \* [384 U.S. at 460]

We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.[30] [384 U.S. at 461]

\* \* \* \* \* \* \*

Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to

---

[4] Reading these decisions broadly, in terms of their "potential for expansion," the dissenters called them "another major step in the direction of the goal which the Court seemingly has in mind—to bar from evidence all admissions obtained from an individual suspected of crime, whether involuntarily made or not." (White, J., dissenting in *Escobedo*, 378 U.S. at 478.) "This is the not so subtle overtone of the opinion—that it is inherently wrong for the police to gather evidence from the accused himself." (White, J., dissenting in *Miranda*, 384 U.S. at 538.)

undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. * * * [384 U.S. at 467]

\* \* \* \* \* \* \*

To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.[43] [384 U.S. at 478, 479]

[Footnote omitted.]

It is noteworthy that in both *Miranda* and *Escobedo* the suspect had been subjected to substantial forms of coercion, and questioned in custody for long periods without access to counsel. While their confessions may have been "voluntary" under earlier cases, the Supreme Court disapproved of the police methods. Despairing of policing the police on a case-by-case basis, the Supreme Court announced requirements intended to better protect fifth and sixth amendment rights by creating a clear limit, well within the old boundary of coercive practices. It is significant that the *Miranda* rule was aimed at police methods, and that it replaced the voluntariness test. Actual coercion and the substantial risk of it are the targets of the *Miranda* opinion.

In *Orozco* v. *Texas*, 394 U.S. 324 (1968), the Supreme Court emphasized that a suspect need not be "in custody at the station house" to be entitled to *Miranda* warnings. The suspect, awakened in the early hours of morning by four policemen, questioned in his bedroom, and "under arrest and not free to leave," had been "otherwise deprived of his freedom of action in a significant way." 394 U.S. at 327. The situation did not differ from station-house interrogation in its potential for intimidation and coercion. But the Supreme Court made it clear that it did not "expand or extend to the slightest extent our *Miranda* decision." Even though *Miranda*, and possibly *Escobedo*, may be properly applied to non-station-house situations, it is our view that such application should be limited to custodial circumstances, as in *Orozco*.

Before the *Miranda* decision it was well settled that a Treasury agent investigating the possibility of a crime against the revenue was not required to warn the taxpayer of his constitutional rights. See *United*

*States* v. *Spomar*, 339 F. 2d 941, 943 (C.A. 7, 1964), certiorari denied 380 U.S. 975; *United States* v. *Sclafani*, 265 F. 2d 408, 414–415 (C.A. 2, 1959), certiorari denied 360 U.S. 918; *Scanlon* v. *Frank*, 223 F. 2d 382, 384–385 (C.A. 1, 1955); *United States* v. *Frank*, 245 F. 2d 284,286 (C.A. 3, 1957), certiorari denied 355 U.S. 819; *Montgomery* v. *United States*, 203 F. 2d 887, 892 (C.A. 5, 1953); *Biggs* v. *United States*, 246 F. 2d 40, 44 (C.A. 6, 1957); and *Zacher* v. *United States*, 227 F. 2d 219, 226 (C.A. 8, 1955).

Several Courts of Appeals have been confronted with the question as to whether statements of a taxpayer under investigation by revenue agents or special agents of the Internal Revenue Service may be received in evidence when the taxpayer has not been given the so-called *Miranda* warnings. Every Court of Appeals, except the Seventh Circuit, has held that this prior rule remains unimpaired by the *Miranda* decision. So long as the taxpayer is not in custody [5] or otherwise deprived of his freedom of action in any significant way at the time he is interviewed by agents of the Internal Revenue Service, they need not give him warnings of his constitutional rights under the fifth and sixth amendments.[6] Moreover, our consideration of many decisions of the Federal appellate courts reveals an unwillingness, in other than income tax cases, to require *Miranda* warnings in noncustody situations, i.e., prior to arrest.[7]

[5] In the rare situation where the taxpayer is actually in custody during an interview with Treasury agents, he must be given constitutional warnings of his rights under the fifth and sixth amendments. *Mathis* v. *United States*, 391 U.S. 1 (1967).

[6] *Spinney* v. *United States*, 385 F. 2d 908 (C.A. 1, 1968), certiorari denied 390 U.S. 921; *Taglianetti* v. *United States*, 398 F. 2d 558 (C.A. 1, 1968), affirmed on another issue 394 U.S. 316 (1969) (per curiam); *Morgan* v. *United States*, 377 F. 2d 507 (C.A. 1, 1967); *Schlinsky* v. *United States*, 379 F. 2d 735 (C.A. 1, 1967), certiorari denied 389 U.S. 920; *United States* v. *Caiello*, 420 F. 2d 471 (C.A. 2, 1969); *United States* v. *White*, 417 F. 2d 89 (C.A. 2, 1969); *United States* v. *Mackiewicz*, 401 F. 2d 219 (C.A. 2, 1968), certiorari denied 393 U.S. 923 (1968); *United States* v. *Squeri*, 398 F. 2d 785 (C.A. 2, 1968); *United States* v. *Browney*, 421 F. 2d 48 (C.A. 4, 1970); *United States* v. *Bagdasian*, 398 F. 2d 971 (C.A. 4, 1968); *United States* v. *Webb*, 398 F. 2d 553 (C.A. 4, 1968); *United States* v. *Mancuso*, 378 F. 2d 612 (C.A. 4, 1967); *Agoranos* v. *United States*, 409 F. 2d 833 (C.A. 5, 1969), certiorari denied 396 U.S. 824; *United States* v. *Maius*, 378 F. 2d 716 (C.A. 6, 1967), certiorari denied 389 U.S. 905; *United States* v. *Campione*, 416 F. 2d 486 (C.A. 7, 1969); *Ping* v. *United States*, 407 F. 2d 157 (C.A. 8, 1969), certiorari denied 395 U.S. 926 (1969); *Cohen* v. *United States*, 405 F. 2d 34 (C.A. 8, 1968), certiorari denied 394 U.S. 943 (1969); *Frohmann* v. *United States*, 380 F. 2d 832 (C.A. 8, 1967), certiorari denied 389 U.S. 976; *Spahr* v. *United States*, 409 F. 2d 1303 (C.A. 9, 1969), certiorari denied 396 U.S. 840; *Feichtmeir* v. *United States*, 389 F. 2d 498 (C.A. 9, 1968); *Selinger* v. *Bigler*, 377 F. 2d 542 (C.A. 9, 1967), certiorari denied 389 U.S. 904; *Hensley* v. *United States*, 406 F. 2d 481 (C.A. 10, 1968); *United States* v. *Jaskiewicz*, 278 F. Supp. 525 (E.D. Pa. 1968); *United States* v. *Reinz*, 22 A.F.T.R. 2d 5316 (E.D. N.Y., 1968); *United States* v. *Gleason*, 265 F. Supp. 880 (S.D. N.Y. 1967); *United States* v. *Kubik*, 266 F. Supp. 501 (S.D. Iowa 1967), affd. 395 F. 2d 170 (C.A. 2, 1968), certiorari denied 393 U.S. 844; *United States* v. *Neves*, 269 F. Supp. 158 (S.D. N.Y. 1967); *United States* v. *Bachman*, 267 F. Supp. 593 (W.D. Pa. 1966); *United States* v. *Carlson*, 260 F. Supp. 423 (E.D. N.Y. 1966); *United States* v. *Fiore*, 258 F. Supp. 435 (W.D. Pa. 1966); *United States* v. *Hill*, 260 F. Supp. 139 (S.D. Cal. 1966); *Stern* v. *Robinson*, 262 F. Supp. 13 (W.D. Tenn. 1966), appeal dismissed 391 F. 2d 601 (C.A. 6, 1967), certiorari denied 390 U.S. 1027.

[7] *United States* v. *Scully*, 415 F. 2d 680 (C.A. 2, 1969); *United States* v. *Messina*, 388 F. 2d 393 (C.A. 2, 1968), certiorari denied 390 U.S. 1026; *United States* v. *Thomas*, 396

We have considered several cases which have approved suppression of evidence because internal revenue agents failed to give the taxpayers *Miranda*-type warnings. In two cases suppression was based on the agent's failure to follow Internal Revenue Service rules regarding warnings. See *United States* v. *Heffner*, 420 F. 2d 809 (1969) ; *United States* v. *Oliver*, 70-1 U.S.T.C. par. 9233 (C.A. 10, 1970). In two other cases the Court found that the taxpayer had been interrogated in a coercive atmosphere. *United States* v. *Lackey*, 413 F. 2d 655 (C.A. 7, 1969) ; *United States* v. *Gower*, 271 F. Supp. 655 (M.D. Pa. 1967). The other cases stand for the broader proposition that once the investigation shifts from civil to criminal, as evidenced by the presence of a special agent or referral to the Intelligence Division, the taxpayer must be given *Miranda* warnings. *United States* v. *Dickerson*, 413 F. 2d 1111 (C.A. 7, 1969) ; *United States* v. *Habig*, 413 F. 2d 1108 (C.A. 7, 1969) ; *United States* v. *Wainwright*, 284 F. Supp. 129 (D. Colo. 1968) ; *United States* v. *Kingry*, an unreported case (N.D. Fla. 1967, 19 A.F.T.R. 2d 762, 67-1 U.S.T.C. par. 9262) ; *United States* v. *Turzynski*, 268 F. Supp. 847 (N.D. Ill. 1967) ; *United States* v. *Schoenburg*, an unreported case (D. Ariz. 1966, 19 A.F.T.R. 2d 348).

Arguments for extending *Miranda* and *Escobedo* to noncustodial criminal tax investigations are presented by the Court of Appeals for the Seventh Circuit in *United States* v. *Dickerson, supra,* and by a note appearing in the University of Chicago Law Review, "The Constitutional Right to Counsel in Tax Investigations," note, 33 U.Chi. L.Rev. 134 (1965). The *Dickerson* panel (Fairchild, *J.,* dissenting) concluded that to insure the admissibility of incriminating statements in a subsequent criminal proceeding it is necessary that *Miranda* warnings be given "at the inception of the first contact with the taxpayer after the case has been transferred to the Intelligence Division."

F. 2d 310 (C.A. 2, 1968) ; *United States* v. *Fiorillo,* 376 F. 2d 180 (C.A. 2, 1967) ; *United States* v. *Knohl,* 379 F. 2d 427 (C.A. 2, 1967), certiorari denied 389 U.S. 973 ; *United States* v. *Fioravanti,* 412 F. 2d 407 (C.A. 3, 1969) ; *United States* v. *Gibson,* 392 F. 2d 373 (C.A. 4, 1968) ; *United States* v. *Webb,* 398 F. 2d 553 (C.A. 4, 1968) ; *Evans* v. *United States,* 377 F. 2d 535 (C.A. 5, 1967) ; *Yates* v. *United States,* 384 F. 2d 586 (C.A. 5, 1967) ; *United States* v. *Johnson,* 414 F. 2d 22 (C.A. 6, 1969) (appeal pending) ; *United States* v. *Agy,* 374 F. 2d 94 (C.A. 6, 1967), certiorari denied 389 U.S. 881 ; *United States* v. *Holmes,* 387 F. 2d 781 (C.A. 7, 1968), certiorari denied 395 U.S. 926 ; *White* v. *United States,* 395 F. 2d 170 (C.A. 8, 1968), certiorari denied 393 U.S. 844 ; *United States* v. *Chase,* 414 F. 2d 780 (C.A. 9, 1969) (per curiam) ; *Lamb* v. *United States,* 414 F. 2d 250 (C.A. 9, 1969) ; *United States* v. *Lee,* 411 F. 2d 1017 (C.A. 9, 1969) (per curiam), certiorari denied 396 U.S. 916 ; *Lowe* v. *United States,* 407 F. 2d 1391 (C.A. 9, 1969) ; *Lucas* v. *United States,* 408 F. 2d 835 (C.A. 9, 1969) ; *United States* v. *Manglona,* 414 F. 2d 642 (C.A. 9, 1969) ; *Medved* v. *United States,* 411 F. 2d 617 (C.A. 9, 1969) ; *Clark* v. *United States,* 400 F. 2d 83 (C.A. 9, 1968), certiorari denied 393 U.S. 1036 (1969) ; *Schoepplin* v. *United States,* 391 F. 2d 390 (C.A. 9, 1968), certiorari denied 393 U.S. 865 ; *White* v. *United States,* 394 F. 2d 49 (C.A. 9, 1968) ; *Arnold* v. *United States,* 382 F. 2d 4 (C.A. 9, 1967) ; *Davidson* v. *United States,* 411 F. 2d 75 (C.A. 10, 1969) ; *Parson* v. *United States,* 387 F. 2d 944 (C.A. 10, 1968) ; *Allen* v. *United States,* 390 F. 2d 476 (C.A. D.C. 1968). But see *Agius* v. *United States,* 413 F. 2d 915 (C.A. 5, 1969) (appeal pending) (suspect, not formally under arrest, was in "custody") ; *Windsor* v. *United States,* 389 F. 2d 530 (C.A. 5, 1968).

The note, written after *Escobedo* but before *Miranda*, goes even further by suggesting the extension of *Miranda*-type warnings by letter to all taxpayers *at the beginning of any tax investigation*, and would require additional warnings by special agents.

The reasoning of the *Dickerson* majority may be understood from the following excerpts:

> We understand the teaching of *Miranda* to be that one confronted with governmental authority in an adversary situation should be accorded the opportunity to make an intelligent decision as to the assertion on relinquishment of those constitutional rights designed to protect him under precisely such circumstances. [413 F. 2d at 1114]

>    *      *      *      *      *      *      *

> Incriminating statements elicited in reliance upon the taxpayer's misapprehension as to the nature of the inquiry, his obligation to respond, and the possible consequences of doing so must be regarded as equally violative of constitutional protections as a custodial confession extracted without proper warnings. [413 F. 2d at 1116]

The opinion was also based on sources expressing doubt that any taxpayer "really felt free to walk out on investigators from the Internal Revenue Service" and the thought that the average citizen thinks "that the government prosecutes only the recalcitrant, uncooperative individual who is unwilling to pay what he owes." 413 F. 2d 1116.

Notwithstanding the views of the Court of Appeals for the Seventh Circuit, we are not persuaded by its rationale or application of the *Miranda* rule. This Court agrees with the Second Circuit (*United States* v. *Caiello*, 420 F. 2d. 471), the Fourth Circuit (*United States* v. *Browney*, 421 F. 2d 48), and the Fifth Circuit (*United States* v. *Prudden*, 424 F. 2d 1021 (C.A. 5, 1970)), which have all rejected the reasoning of the majority opinion in *Dickerson*. We think the interpretation of *Miranda* and the fifth and sixth amendments by the Dickerson majority goes beyond their permissible limits. We may agree that a taxpayer does not feel entirely free to walk out on an agent of the Internal Revenue Service, that he may feel an obligation to respond to questions, and that he may not be alert to the consequences flowing from his remarks. No doubt a taxpayer experiences some fear, nervousness, or subtle pressure during an Internal Revenue Service audit or investigation, but, in the usual case, interrogation by Treasury agents simply does not approach the coercive level of a policeman in uniform, the sight of a gun or nightstick, arrest or threat of it, the nearby bars of the jail, and the sense of condemnation felt by police suspects.

We are not persuaded by the argument that a noncustodial interview takes unfair advantage of the taxpayer's lack of legal advice. See note, 33 U. Chi. L. Rev. 134, *supra*. The taxpayer is aware that the purpose of the investigation is to determine his tax liability, and it can be assumed that he knows that there are penalties of some sort for cheat-

ing. We share the following views expressed by the Court of Appeals in *United States* v. *Caiello, supra* at 475:

> We can see no good reason for requiring government agents to give *Miranda* warnings whenever they deal with a citizen regarding possible tax liabilities under circumstances where the citizen is not under restraint and is at liberty to cooperate or not as he may choose. Every citizen must know and will be deemed to know that he is under an obligation honestly and fully to furnish correct information regarding his income and to pay the taxes which accordingly would be owing to the government. Every citizen also knows that false returns and fraudulent evasion of taxes are criminal offenses in violation of federal laws. So far as the citizen is concerned his duties and obligations and his liabilities for taxes for violation of law are the same regardless of the duties of the particular agents who may be assigned to investigate his returns, tax liabilities, and possible violations of the criminal law. And, of course, where there is no restraint and the contacts of the taxpayer and the agents extend over some period of time, there is ample opportunity for the taxpayer to seek such advice and assistance from third persons as he may desire. * * *

Absent coercion or the substantial risk of it, there can be no violation of fifth amendment rights. It was therefore unnecessary for Tryforos to warn petitioner of her constitutional rights in a noncustodial, noncoercive atmosphere.

Administration of the Federal tax laws depends heavily upon taxpayer cooperation and disclosure. Indeed, certain information is likely to come to light only through taxpayer cooperation. We will not erect an unnecessary barrier to voluntary disclosure and admissions by requiring warnings of constitutional rights where noncoerced statements are given to Treasury agents. *United States* v. *Prudden, supra*. To do so would foreclose the use of highly probative and reliable evidence.

In applying the safeguards of the fifth amendment and its sixth amendment corollaries we discern a tendency to rely and expand upon judicial slogans. The oft-used phrase "privilege against self-incrimination" is itself an example of this tendency. The criminal law in each and every case depends upon evidence by which the individual by word or deed incriminates himself. The plain language of the fifth amendment is that no person "shall be compelled in a criminal case to be a witness against himself." The fifth amendment frame of reference is "a criminal case" and the key word is "compelled." The exclusionary rule invoked in *Miranda* has its roots in the word "compelled." The coercive atmosphere of jails, prisons, and detention cells calls for negation and neutralization of that compulsive environment through the protection of the advice of counsel and the warning that the person is not "compelled" to be a witness against himself.

In our judgment the *Miranda* rule does not apply in the circumstances of this case. The statements made by Constance Harper to Revenue Agent Tryforos are admissible. All that has been shown here

is that the audit begun by Tryforos became a criminal investigation, and that the petitioner was never so advised, although after retaining her counsel, he knew that a criminal investigation was being conducted. There is no evidence of misrepresentation, coercion, fraud, deceit, or trickery by the Treasury agents. This is simply a case of failure to warn in noncustodial surroundings. The *Miranda* case dealt with custodial interrogation, not only on its facts but also in the words repeatedly used by the Supreme Court to define the new doctrine. See 384 U.S. at 439, 440, 444, 445, 446, 457, 465, 477, and 478. *Miranda* thus clearly intends that the requirements of a warning of constitutional rights and a demonstration of intelligent waiver of those rights are to be confined to situations of "custodial interrogation." The recitation of that term throughout the opinion and the prefacing of the decision with a lengthy recital of police abuses leave no doubt as to what situations the Supreme Court had in mind in reaching its decision. In *United States* v. *Squeri*, 398 F. 2d 785 (C.A. 2, 1968), the Court of Appeals said (p. 790):

The Fifth Amendment privilege prohibits the government from *compelling* a person to incriminate himself. It was the compulsive aspect of custodial interrogation, and not the strength or extent of the government's suspicions at the time the question was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning. We believe that the presence or absence of compelling pressures, rather than the stage to which the government's investigation has developed, determines whether the *Miranda* requirements apply to any particular instance of questioning. * * *

## B. Civil Tax Fraud Proceeding

An alternative reason for treating petitioner's statements at the June 28, 1961, interview as competent evidence in this case is that the absence of *Miranda* warnings does not bar the use of admissions in a civil tax fraud proceeding. The fifth and sixth amendments of the Constitution are generally not applicable in a civil case, although the limitation to criminal cases does not prevent persons from claiming the privilege in noncriminal proceedings when there exists the possibility of subsequent criminal prosecution. See, e.g., *Grunewald* v. *United States*, 353 U.S. 391 (1957) (grand jury) ; *Quinn* v. *United States*, 349 U.S. 155 (1959) (legislative investigation); *Smith* v. *United States*, 337 U.S. 137 (1949) (administrative investigation) ; *McCarthy* v. *Arndstein*, 266 U.S. 34 (1924) (civil cases). But when the threat of criminal prosecution is removed, by the grant of immunity "coextensive with the scope of the privilege against self-incrimination," then testimony may be compelled. See *Murphy* v. *Waterfront Commission*, 378 U.S. 52 (1963).

Where there is no threat of criminal prosecution, a person may not claim the privilege, even if testifying may cause him to lose his job,

*Pfitzinger* v. *Civil Service Commission*, 96 F. Supp. 1 (D.N.J. 1951), affirmed per curiam 192 F. 2d 934 (C.A. 3, 1951) ; or his citizenship, *DaCosta* v. *Holland*, 151 F. Supp. 746 (E.D. Pa. 1957) (deportation) ; *United States* v. *Costello*, 144 F. Supp. 779 (S.D.N.Y. 1956) (denaturalization) ; or his reputation, cf. *United States* v. *Orman*, 207 F. 2d 148 (C.A. 3, 1953) ; *United States* v. *Thomas*, 49 F. Supp. 547 (W.D. Ky. 1943) ; *Brown* v. *Walker*, 161 U.S. 591 (1896). These cases must be distinguished from those suggesting that it may be unconstitutional to impose like penalties for properly invoking the privilege. Compare *Garrity* v. *New Jersey*, 385 U.S. 493 (1967) ; *Slochower* v. *Board of Education*, 350 U.S. 551 (1956). In these latter cases there existed the threat of criminal prosecution.

In this case the threat of criminal prosecution has been removed. Even if it had not been, the cases declining to compel testimony because of the possibility of prosecution are not applicable. Here the statements have already been made, and a decision to admit them does not compel testimony, nor does it require their admission or exclusion in a criminal case.

One case appears to allow the claim of privilege in a civil proceeding where there was no threat of further criminal prosecution. *Boyd* v. *United States*, 116 U.S. 616 (1886), followed in *Lees* v. *United States*, 150 U.S. 476 (1893). Relying on "that one cardinal rule of the court of chancery * * * never to decree a discovery which might tend to convict the party of a crime, or to forfeit his property," 116 U.S. at 631, Justice Bradley said that it violated the fourth and fifth amendments to compel the production of papers in a forfeiture proceeding. See also *Ullmann* v. *United States*, 350 U.S. 422, 442 (1956) (Douglas J., dissenting). ("Any forfeiture of rights as a result of compelled testimony is at war with the Fifth Amendment.") However, the forfeiture in *Boyd* was merely an adjunct to the criminal proceedings, involving the instruments of the crime and requiring conviction for the crime. It has been held inapplicable where the forfeiture proceeding was independent of any criminal proceeding. *Kent* v. *United States*, 157 F. 2d 1 (C.A. 5, 1946) (on rehearing).

A civil tax fraud case is not "a criminal case" or the adjunct of one. The civil aspects of Federal tax controversies should not be confused with separate criminal penalties. *Spies* v. *United States*, 317 U.S. 492 (1942) ; *Acker* v. *Commissioner*, 258 F. 2d 568 (C.A. 6, 1956), affirming 26 T.C. 107 (1956). In *Helvering* v. *Mitchell*, 303 U.S. 391 (1938), the Supreme Court pointed out the distinction between civil additions to tax for fraud and criminal fraud penalties:

The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation. They are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and loss resulting from the taxpayer's fraud. * * *

In its remedial nature, an addition to tax for fraud resembles the treble damages provision for enforcement of the Emergency Price Control Act of 1942. See *Craig* v. *Porter*, 157 F. 2d 410 (C.A. 8, 1946). The defendant in a civil enforcement proceeding under that Act was not permitted to claim fifth amendment protection. *Craig* v. *Porter*, *supra; Bowles* v. *Seitz*, 62 F. Supp. 773 (W.D. Tenn. 1945); *Bowles* v. *Benard*, 57 F. Supp. 94 (E.D. Wis. 1944); *Bowles* v. *Chew*, 53 F. Supp. 787 (N.D. Cal 1944); cf. *Martino* v. *Holzworth*, 158 F. 2d 845 (C.A. 8, 1947). See also *Schinkal* v. *United States*, 225 F. 2d 882 (C.A. 9, 1955).

"'Penalty' is a term of varying and uncertain meaning." *Life & Casualty Co.* v. *McCray*, 291 U.S. 566, 574 (1934). In an area where Congress has expressly provided for criminal penalties, we conclude that a lesser sanction, requiring a lesser burden of proof, is not a criminal penalty. *Helvering* v. *Mitchell*, *supra*. It follows that in this civil tax case the fifth amendment is no bar to the admissibility of petitioner's prior statements to the revenue agents.

### III. *Understatements of Income, Overstatements of Expenses, and Fraud*

It is clear from our findings of fact that the petitioners failed to report substantial amounts of rental income during the years 1957 through 1960. It is now well established that in a civil tax fraud case "consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." *Schwarzkopf* v. *Commissioner*, 246 F. 2d 731, 734 (C.A. 3, 1957); *Kurnick* v. *Commissioner*, 232 F. 2d 678 (C.A. 6, 1956); *Merritt* v. *Commissioner*, 301 F. 2d 484 (C.A. 5, 1962); and *Anderson* v. *Commissioner*, 250 F. 2d 242 (C.A. 5, 1957).

Petitioners failed to report any of their income from interest and dividends. Although we recognize the mitigating factors that Forms 1099 were not then required to be sent to petitioner and that her education was limited, the consistent omission of these substantial amounts of income each year is, we think, indicative of fraud.

In addition, we have found that petitioners' expenses were far less than the amounts claimed on their income tax returns. The disparity generally results from their failure to meet their burden of proof because most of their records were unavailable. The amounts we have allowed for rent, fuel, taxes, water, utilities, insurance, and telephone are those which were substantiated and allowed by respondent. Petitioners have not proved any greater amounts. All of the amounts we have found for other expenses are derived from Constance Harper's sketchy testimony and scanty records. Depreciation on the buildings was calculated at 4 percent per year, allocating 60 percent of the cost

to the buildings, as agreed by the respondent. Of course, petitioners' failure of proof on these expense items for deficiency purposes does not relieve respondent of the ultimate burden of proving fraud by clear and convincing evidence. To do otherwise would be piling inference on inference. See *Thomas B. Jones*, 29 T.C. 601 (1957) (each party failed to meet its burden) ; cf. *Valetti* v. *Commissioner*, 260 F. 2d 185 (C.A. 3, 1958) ; *Goldberg* v. *Commissioner*, 239 F. 2d 316 (C.A. 5, 1956). "[B]are figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them." *Holland* v. *United States*, 348 U.S. at 128.

But two expense items in particular should be mentioned. First, petitioners claimed rental expense of $4,080 in each year for the properties at 16 and 18 West 130th Street. The lease provided for rent of $3,491.40 per year. Petitioner testified that she was required to pay an additional $120 per quarter for unexplained reasons. No such provision appears in the lease. We find her testimony unreliable. Secondly, petitioners' reported income and expenses remained virtually the same in 1959 and 1960, even though they had sold in December 1959 2 of the 10 rental properties they operated. Even by their own reckoning this means the loss of 24 rooms, income of $174.91 per month, and the expenses incident to these properties. Respondent has obscured the force of these facts by his willingness to allow expenses uniform in amount over all 4 years, but nonetheless this is evidence that petitioners' income tax return for 1960, at least, did not reflect their actual circumstances. We think these two items suggest that petitioners were padding their expenses in all 4 years, and that their strikingly similar returns in 1959 and 1960 did not reflect their actual income and expenses, but were designed with the hope that through consistency they might escape audit and pay less tax. Cf. *John McKeon*, 39 B.TA. 813 (1939).

When bank deposits calculations disclosed that petitioners had understated their gross income from rentals, they attempted to show a nontaxable source for this unreported income. Constance Harper testified that her brother, Lionel Cushnie, died in Jamaica in 1950, leaving her property valued at 22,000 pounds. She said this property was converted to cash and left in joint savings accounts with her cousin, Coralee Williams. She further testified that she was unable to get the money out of Jamaica until the late 1950's, when she and her family began bringing it up a "thousand pounds at a time." We find such testimony unworthy of belief. From 1957 through 1960, when petitioner supposedly was bringing thousands of pounds from Jamaica to New York, she was in fact transferring $38,000 from New York to Jamaican bank accounts. Respondent introduced the checks which were deposited to her Jamaican accounts. Also, when interviewed by

Agents Tryforos and Woulfowitz about the source of her bank deposits, petitioner stated that she had received no inheritances, which suggests that the 1950 inheritance has no bearing on the years in controversy.

Petitioner also introduced calculations intended to show that her rental income did not exceed the amount reported. This, of course, raises the source problem. Using maximum legal rent figures, excluding basement rooms, and assuming 75-percent occupancy in her buildings, petitioner's figures do correspond with her returns. Respondent did not attack this statement directly, by determining whether petitioner did indeed charge the legal rent, or whether she rented basement rooms, or whether her occupancy exceeded 75 percent. Instead, respondent chose to rely on petitioner's statements to its agents. Petitioner stated that she had no source of income other than her rental properties. Having already determined that this statement is both admissible and reliable, we find that respondent has succeeded in negating nontaxable sources for petitioner's unreported income. See *Holland* v. *United States, supra.*

Petitioners sold their properties at 20 and 22 West 130th Street in December 1959. They did not report these sales in either 1959 or 1960. Constance Harper's explanation was that she thought that she must first recover her basis before recognizing and reporting the gain. We cannot accept her explanation for failure to report the sales. Petitioners purchased the building at 22 West 130th Street on April 20, 1938, for $11,200. They allocated $8,000 to the building and depreciated it at 4 percent per year. By the time of sale their basis would have been reduced by depreciation of $6,922.20 to $4,277.80. They received $4,000 by closing, and $116.68 per month on the mortgage, beginning January 28, 1960. By the first half of 1960, petitioners' receipts exceeded their basis. Yet they did not disclose the sale, or any income from it, in 1960. Under the circumstances we think they deliberately concealed these sales with the intent of evading the payment of taxes on money received from the properties in 1959 and 1960.

Petitioners were under a duty to keep adequate books and records. Sec. 6001 and the regulations thereunder. Their failure to do so is some evidence of fraud. *Bollella* v. *Commissioner*, 374 F. 2d 96 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court. However, the failure to produce what records they did have, prior to their destruction by fire and water, raises troublesome issues. At that time petitioners faced the possibility of criminal prosecution, and they refused to produce possibly incriminating records. Whether they could be compelled to produce them involves examination of the scope of the fifth amendment and the required-records doctrine. See *Shapiro* v. *United States*, 335 U.S. 1 (1948); *Reisman* v. *Caplin*, 375 U.S. 440

(1964); *United States* v. *Powell*, 379 U.S. 48 (1964); *Spevack* v. *Klein*, 385 U.S. 511 (1967). If they could not be compelled to do so, there remains the question of what inferences, and what civil consequences, may flow from the exercise of this constitutional right. See *Garrity* v. *New Jersey, supra; Spevack* v. *Klein, supra; Griffin* v. *California*, 380 U.S. 609 (1965). In view of other evidence of fraud in this case, we have found it unnecessary to draw any inference from petitioners' failure to produce records.

All in all, we conclude on this record that petitioners' failure to maintain accurate and complete records, their failure to report as income substantial receipts from their rental business as well as interest and dividends, their overstatement of particular business expenses, their concealment of real property sales, and Constance's inconsistent, unreliable, and misleading statements to the revenue agents, were part and parcel of a conscious and deliberate attempt to evade the payment of their tax liabilities for each of the years 1957 through 1960. Accordingly, we hold that respondent has met his burden of proving fraud by clear and convincing evidence. We also sustain respondent's determination of the deficiencies subject to the modifications contained in our Findings of Fact. Cf. *Cefalu* v. *Commissioner*, 276 F. 2d 122 (C.A. 5, 1960).

## IV. *Statute of Limitations*

Having determined that a part of the underpayment of tax for the year 1957 was due to fraud with intent to evade tax, it follows that the assessment of the deficiency for that year, and for all of the years before us, is not barred by the statute of limitations. See sec. 6501(c) (1). In any event, petitioners did not plead the statute of limitations for the other years.

## V. *Dependency Exemptions*

We are satisfied that in each of the years 1957 through 1960 the petitioners provided over half of the total support of Joy Cushnie, a niece, and Maude Curlew, an aunt. See secs. 151(e) and 152(a). Accordingly, petitioners should be allowed dependency exemption deductions for both of them for those years. And since John Harper had attained the age of 65 before the end of 1959, petitioners are entitled to an additional exemption of $600 for him in each of the years 1959 and 1960. Petitioners failed to claim any additional exemption for John on their Federal income tax returns for 1959 and 1960.

## VI. *Sales of Real Property—Installment Method*

Petitioners did not report on their income tax returns for either 1959 or 1960 the sales or any income from the sales of their real prop-

erty at 20 and 22 West 130th Street. The sales were made on December 28, 1959, and petitioners received $4,000 for each property in 1959, or a total of $8,000. In 1960 they received $1,400.16 in mortgage payments on each property, or a total of $2,800.32. For the first time at the trial of this case petitioners' counsel stated that they elect to report these real property sales on the installment method pursuant to the provisions of section 453.⁸ This purported election was reiterated in written form in their opening brief. In support of their contention that they now have the right to elect to report the sales of the real property on the installment method, petitioners cite and rely on section 1.453–8(b), Income Tax Regs.; Rev. Rul. 65–297, 1965–2 C.B. 152; and *O'de Baca* v. *Commissioner*, 326 F. 2d 189 (C.A. 5, 1964), reversing 38 T.C. 609 (1962).

Section 1.453–8(b)(1), Income Tax Regs., provides as follows:

(b) Sales of real property and casual sales of personal property. (1) A taxpayer who sells or otherwise disposes of real property, or who makes a casual sale or other casual disposition of personal property, and who elects to report the income therefrom on the installment method must set forth in his income tax return (or in a statement attached thereto) for the year of the sale or other disposition the computation of the gross profit on the sale or other disposition under the installment method. In any taxable year in which the taxpayer re-

---

⁸ SEC. 453. INSTALLMENT METHOD.
    (a) DEALERS IN PERSONAL PROPERTY.—
    (1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.
    (2) TOTAL CONTRACT PRICE.—For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. This paragraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph (1).
    (b) SALES OF REALTY AND CASUAL SALES OF PERSONALITY.—
    (1) GENERAL RULE.—Income from—
        (A) a sale or other disposition of real property, or
        (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,
    may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).
    (2) LIMITATION.—Paragraph (1) shall apply—
        (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—
            (i) there are no payments, or
            (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.
        (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a) of such code.

ceives payments attributable to such sale or other disposition, he must also show in his income tax return the computation of the amount of income which is being reported in that year on such sale or other disposition.

This regulation was held valid and reasonable in *Ackerman* v. *Commissioner*, 318 F. 2d 402 (C.A. 10, 1963), which required the election to report a sale of real property on the installment method to be made in a *timely* filed income tax return for the taxable year of the sale. See and compare *John P. Reaver*, 42 T.C. 72 (1964).

Prior to the promulgation of the regulations under section 453, several cases arose which involved section 44 of the 1939 Code (the predecessor of section 453) and the then applicable regulations, section 39.44–3, Regs. 118. See, e.g., *Hornberger* v. *Commissioner*, 289 F 2d 602 (C.A. 5, 1961), reversing a Memorandum Opinion of this Court; *C'de Baca* v. *Commissioner, supra;* and *F. E. McGillick Co.*, 42 T.C. 1059 (1964). Neither the 1939 Code section nor the regulations in force until September 1958 required an election to be made by the taxpayer at a certain time or in a certain manner. There was no mention of an election. *Hornberger* v. *Commissioner, supra* at 604.

In the *Hornberger* case a sale of realty through inadvertence was not reported on the taxpayer's return for the year of sale. This Court held that the taxpayer was not entitled to correct the omission and gain the benefit of the installment method because the election to use such method was untimely. But the Court of Appeals, in reversing us, concluded that the Commissioner, in denying the taxpayer the privilege of using the installment method, was reading into the statute a requirement for timely election not found there, and was seeking to invoke a heavy sanction not expressly authorized in either the statute or the regulations. The Court of Appeals stated (289 F. 2d at 604) :

It is, of course, necessary for the taxpayer to report his income for tax purposes. Normally, this obligation is met by taxpayers who report all transactions that result in taxable income. To the extent that one fails to do this he is immediately faced with the obligation of accounting for such failure. If due to negligence or fraud moderate to heavy sanctions are imposed. If resulting from honest error, as here, all that is required is that the omission be rectified, if not voluntarily by the taxpayer, then upon deficiency notice from the Commissioner. Here the government seeks to invoke a heavy sanction in the case of a non-negligent good faith omission that the statute does not expressly authorize.

In the *C'de Baca* case the taxpayer sold a farm during 1953 but negligently failed to file a 1953 income tax return until March 1957. We held that since the taxpayer's income tax return for 1953 was not timely filed, she had forfeited the right to report the profits received from the sale of the farm in 1953 on the installment method. Again the Court of Appeals for the Fifth Circuit reversed. In doing so, it made the following comments (326 F. 2d at 191) :

The Commissioner here placed great significance upon the fact that in the *Hornberger* case the omission was non-negligent. Nevertheless, it is just as true that neither the statute nor the regulation authorizes this sanction in the case of a negligent omission, as in the case of a non-negligent omission. We think that the penalty provisions for negligence and for failure to make a timely estimate completely exhaust the power in the Commissioner or the courts to penalize for these omissions. The law does not lightly impose penalties and courts look with disfavor on forfeitures. Other cases favoring the taxpayer's general contention that the election requirements of § 44(b) are not to be applied in a more restrictive fashion is here decided are United States v. Eversman, 6 Cir., 133 F. 2d 261; Scales v. Commissioners, 6 Cir., 211 F. 2d 133; Nunn v. Grey (W.D. Ken.) 196 F. Supp. 305; and Stouffer v. United States, 225 F. Supp. 965 (S.D. Ohio). We think, however, that we need go no further than the Hornberger case to find the controlling principle here, that is, that the statute does not authorize the imposition of an added penalty for the late filing of the 1953 tax return in the nature of a forfeiture of the rights of the taxpayer to make an election to treat as an installment sale a sale which in all other respects is subject to such treatment.

In the subsequently court reviewed opinion in *F. E. McGillick Co.*, *supra*, we decided to "follow the principles announced by the Court of Appeals" in the *C'de Baca* case.

In 1965 the Internal Revenue Service modified its position in Rev. Rul. 65–297, *supra*, by stating, in part, as follows:

if, *in good faith*, the taxpayer failed to exercise the installment method election on a timely filed original return for the year of sale, the IRS will recognize as *valid elections* made under the following circumstances:

1. Those cases where the sale took place in a taxable year ended before December 18, 1958, if the election was made in the return for the year the first payment from the sale was received. December 18, 1958, is the date the present regulations were effective.

2. Those cases where election of the installment method was made on *an amended return* for the year of sale not barred by the statute of limitations or the operation of any other law or rule of law, *if the facts indicate no election inconsistent with the installment election had been made with respect to the sale.*

3. Those cases where the election was made on a delinquent return for the year of sale.

[Emphasis added.]

It is obvious that paragraphs 1 and 3 of the above-quoted revenue ruling are inapplicable to the situation facing us in this case. The question is whether paragraph 2 applies. We think it does not apply for three reasons: (1) The petitioners did not *in good faith* fail to exercise the installment method election; (2) the petitioners have to date made no election of the installment method on an amended return for 1959 or for that matter on any return for any year; and (3) the failure of the petitioners to report the sales and income received therefrom in 1959 and 1960 is "inconsistent" with the election of the installment method. Where, as here, a taxpayer fraudulently conceals

sales of real property by failing to report them or the income received therefrom on his income tax return and attempts to exercise his election to report the sales on the installment method only after his fraudulent omission is discovered by the Commissioner, the attempted election will be treated as invalid and he will not be entitled to the benefits of the installment method of reporting the gain on the sales. We think a *good-faith disclosure* of the sale on the taxpayer's income tax return (original or amended) or in a statement attached thereto is necessary for a valid election to be made under section 1.453–8(b), Income Tax Regs; *Mamula* v. *Commissioner*, 346 F. 2d 1016, 1019–1020 (C.A. 9, 1965) ; and see *John P. Reaver, supra* at 81–82, where this Court said :

Here, petitioners made *an honest mistake* and rectified it at the first opportunity. We discern no reason why petitioners' amended return for the year of sale, filed within the period for determining a deficiency for 1958 or for any year affected, should not be deemed to be compliance with the requirements of the regulations. *Petitioners have never adopted any position inconsistent with that reflected in the amended return;* they have never represented that they were using any other method of account for their gain on the sale; *the entire receipts were included in income; all the information required by the regulations was supplied in the amended return,* and *respondent at no time could have been misled* to his disadvantage. [Emphasis added.]

To be sharply distinguished is the case of *Bookwalter* v. *Mayer*, 345 F. 2d 476 (C.A. 8, 1965), where the taxpayers, after making a full disclosure of the sale to revenue agents in several conferences, were advised that it was not necessary for them to make an election in their 1958 income tax return. Thus their good-faith "silence" in the 1958 return, as contrasted to the deliberate concealment in the instant case, did not cause the taxpayers to forfeit their right to make the election when they offered to file an amended return for 1958 when the Government later changed its position to the taxpayers' detriment.

We also find the *C'de Baca* case distinguishable from this case on three grounds : (1) It involved an untimely, not a fraudulent, return ; (2) it involved section 39.44–3(1) of Regs. 118 and not section 1.453–8(b), Income Tax Regs.; and (3) the taxpayer there, unlike the petitioners here, had not adopted a position inconsistent with that reflected in her delinquent return. In any event, we are not inclined to extend the rationale of *C'de Baca* beyond those cases where a good faith election is made on a delinquent return.

Accordingly, we hold that since the petitioners have failed to make a valid election to report their sales of real property on the installment method, they are not entitled to return the income and profit on the sales under the provisions of section 453(b).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

SCOTT, *J.*, concurring: While I have no disagreement with the holding of the majority, I would not include in the opinion the discussion of the admissibility in a *criminal case* of incriminating statements made *after* an investigation had become a *criminal investigation* by its transfer to the "Intelligence Division." This discussion is pure dicta. Our case is a *civil fraud* case and as the majority holds, statements made by a taxpayer under any circumstances are admissible although the circumstances under which the statements were made is likewise admissible as an aid in determining the weight to be given to the statements. Also, the facts here show that the statements involved were made *prior to* the commencement of any criminal investigation and under the holdings of all the circuit Courts of Appeal which have passed on the question would be admissible even in a criminal case.

---

TANNENWALD, *J.*, concurring in part and dissenting in part: I agree with the majority opinion that warnings with respect to constitutional rights, including the right to counsel, specified in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), are unnecessary in order for evidence procured through noncustodial interrogation to be admissible in a civil tax case.

Nevertheless, I do not believe that petitioners' filing of a fraudulent return, within the meaning of section 6653(b), should preclude the petitioners from computing their income tax liability by use of the installment method. In holding to the contrary, the majority ignores the language of this Court in *F. E. McGillick Co.*, 42 T.C. 1059, 1066–1067 (1964), where we stated:

From our analysis of the statute, correlative regulations, and cases, we now conclude that the controlling legal principle is as stated in the *Baca* case. To reiterate, that principle is "that the statute does not authorize the imposition of an added penalty for the late filing of [a] tax return in the nature of a forfeiture of the rights of the taxpayer to make an election to treat as an installment sale a sale which in all other respects is subject to such treatment." Accordingly, we will hereafter follow the principles announced by the Court of Appeals in *Baca*.

*Baca* v. *Commissioner*, 326 F. 2d 189 (C.A. 5, 1964), remanding 38 T.C. 609 (1962), thus referred to by the Court, in turn relied upon *Hornberger* v. *Commissioner*, 289 F. 2d 602 (C.A. 5, 1961), reversing a Memorandum Opinion of this Court, where the Fifth Circuit stated:

We are not dealing with a statute which in express terms requires an *election* by the taxpayer at a certain time or in a certain manner, or that in fact even mentions an "election" at all. [289 F. 2d at 604.]

It rejected the view that "the failure to give the facts touching on the sale [excusable in this case] somehow should be penalized." 289 F. 2d at 605. "If a failure to report an income producing sale is excus-

able and may be corrected without penalty for all other purposes of the income tax laws, we perceive no reason why, if reported or claimed as an installment sale while the year of sale is still open to adjustment under the statute and if it has not been treated in an inconsistent manner, this should not entitle the taxpayer to installment treatment of the sale." 289 F. 2d at 606.

In *Baca*, respondent had attempted to distinguish *Hornberger* by emphasizing that the omission in that case had been nonnegligent. 326 F. 2d at 191. The Fifth Circuit rejected respondent's contention and stated "We think that the penalty provisions for negligence and for failure to make a timely estimate completely exhaust the power in the Commissioner or the courts to penalize for these omissions." *Ibid.* It held that, despite the taxpayer's negligence, he was entitled to elect the installment method.

The majority herein states that a requisite for use of the installment method of reporting gain on sales is good faith disclosure of the sale on the taxpayer's original or amended return or in a statement attached thereto. I think *Baca* disposes of any good-faith requirement, because it makes clear that negligent failure to file a return is not equated with lack of good faith or nonexcusable omissions. I fail to see why the fraud penalty should require a different result in this area. Congress considered the 50-percent addition for fraud, together with criminal provisions, a sufficient deterrent to the sort of concealment found in this case. "The law does not lightly impose penalties and courts look with disfavor on forfeitures." *Baca* v. *Commissioner*, 326 F. 2d at 191. A finding of fraud does not require, or even authorize, us to construe every aspect of the tax law against the petitioner.

Section 1.453–8(b)(1), Income Tax Regs., effective December 18, 1958, does not affect the force of *Baca*. Initially, respondent took the position that, under these regulations, the failure to disclose the transaction on the return "for the year of the sale" disqualified taxpayers from adopting the installment provisions. This position was upheld by the Tenth Circuit. *Ackerman* v. *United States*, 318 F. 2d 402 (C.A. 10, 1963). But in *Bookwalter* v. *Mayer*, 345 F. 2d 476 (C.A. 8, 1965), where the taxpayer had offered to amend his return, the Eighth Circuit rejected the position that "by silence, taxpayer forfeits his right to make an election. * * * [T]he Commissioner knows how to use apt language to compel an election in an original return." [1] 345 F. 2d at 478, 479. The Commissioner has since acquiesced in *Bookwalter* v. *Mayer*, Rev. Rul. 65–297, 1965–2 C.B. 152. Moreover, in *Hornberger*, only one of the petitioners had filed an amended return. The other

[1] Compare sec. 1.453–8(a)(1), Income Tax Regs., where a dealer in personal property is required to make his election to use the installment method "on or before the time specified (including extensions thereof) for filing such return."

made his claim at trial. Thus, I do not regard an amended return as the exclusive means of adopting the installment method.

*Bookwalter* is admittedly distinguishable on its facts from the instant case. There the taxpayer did not report the transaction in the year of sale because he received no payments in that year. His was an honest mistake, unlike that of the petitioners, but to distinguish *Bookwalter* requires a rejection of the reasoning of *Baca* and our own holding in *F. E. McGillick Co., supra*, solely because petitioners filed a fraudulent return.

I would hold that imposition of the addition to tax for fraud is the exclusive penalty applicable in this case.[2]

STERRETT, *J.*, agrees with this opinion.

---

[2] I note that, in view of the finding of fraud for the first year and consents extending the period of limitations for the subsequent years, there is no possibility herein that giving the petitioners the right to elect the installment method will cause any of the profit to escape taxation. Compare also sec. 1311 *et seq*.