**UNITED STATES of America,
Appellee,**

v.

**William H. WEBB, Appellant.**

**No. 11591.**

United States Court of Appeals
Fourth Circuit.

Argued March 6, 1968.

Decided July 16, 1968.

Nathan L. Silberberg, Washington, D. C. (Howard B. Silberberg, Washington, D. C., on the brief) for appellant.

Arthur F. Bronczyk, Regional Counsel, Interstate Commerce Commission (Bernard A. Gould, Director, Bureau of Enforcement, and Mark J. Rubald, Trial Attorney, Interstate Commerce Commission, and Claude V. Spratley, Jr., U. S. Atty., and Samuel W. Phillips, Asst. U. S. Atty., on the brief) for appellee.

Before SOBELOFF and BRYAN, Circuit Judges, and MacKENZIE, District Judge.

SOBELOFF, Circuit Judge:

An Interstate Commerce Commission regulated carrier, William Webb, here appeals from his conviction on seven counts of aiding and abetting another trucker, James Dunn[1] to engage in unauthorized hauling for hire in violation of 49 U.S.C. § 303(c).[2] 18 U.S.C. § 2.[3] While appellant alleges numerous trial errors, our primary concern is with his contention that the failure to advise him fully of his constitutional rights renders inadmissible all documents and statements gathered during an ICC investigation. In advancing this argument, Webb relies exclusively on the Supreme Court's decision in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For reasons fully developed below, we are convinced that the facts of this case do not bring it within the ambit of *Miranda*.

The uncontroverted testimony discloses that in 1961 Dunn applied to the ICC for authority to operate as a common carrier in interstate commerce. Webb appeared as an opposing witness at a hearing on Dunn's application, which was subsequently denied. After the hearing, Webb approached Dunn, proposing that they execute a leasing agreement which would enable Dunn to engage in interstate hauling without obtaining an ICC certificate. Shortly thereafter, the two men signed a document which on its face was a lease of Dunn's trucks to Webb. It purported that Webb was assuming complete control and responsibility for the operation of

1. Dunn, doing business as Dunn Motor Lines, was also prosecuted. He was charged in twenty counts with engaging in unauthorized transportation in violation of 49 U.S.C. § 303(c). He entered a plea of guilty to ten of the counts, seven of which involved a leasing arrangement with appellant Webb.

2. Section 303(c) provides:
"* * * no person shall engage in any for-hire transportation business by motor vehicle, in interstate or foreign commerce, on any public highway or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with

respect to such person a certificate or permit issued by the Commission authorizing such transportation * * *."

3. The section under which Webb was indicted reads as follows:
Section 2
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

the equipment. It further recited that Dunn was to be paid 85% of the gross revenue arising from the use of his vehicles.

In response to a complaint filed with the ICC by a person undisclosed in the record, Commission Agent Waldron was instructed to make an investigation of Dunn. As a result of his initial interview with Dunn, Waldron decided that a collateral investigation of appellant Webb was in order. He went to Webb's office, introduced himself as an ICC agent and requested certain invoices, freight bills, driver's logs, and equipment leases, all of which Webb was obligated by ICC regulations to keep. 49 C.F.R. § 207; 49 U.S.C. § 320(d). Webb voluntarily released the records to Waldron who, before leaving, questioned Webb concerning the leasing arrangement. About a month later, Waldron returned to Webb's office with a statement prepared on the basis of information gleaned from the documents furnished by Webb and from interviews with him and others.

The statement recounted that Webb had been approached by an official of the Concrete Structures Company, a concern that for some period of time had employed Dunn to do its hauling. This person requested that Webb enter into a leasing arrangement with Dunn so that the latter could continue to handle Concrete's trucking which was about to expand to interstate shipments. In the statement Webb acknowledged that, contrary to the ostensible agreement, other than making an initial inspection of the vehicles, he had no participation in the business of hauling for Concrete Structures. He neither handled shipping orders nor exercised any control whatever over the trucks, which were actually used by the uncertified Dunn.

There is no dispute as to the circumstances under which Webb signed the proffered statement. Upon entering Webb's office, Waldron handed him the statement and the two men again briefly discussed the arrangement that had been made between Webb and Dunn. Waldron explicitly told Webb that he did not have to sign the statement. He did not, however, inform him that the inquiry might eventuate in a criminal charge nor did he advise Webb that he had a constitutional right to counsel or to remain silent. Appellant therefore argues that it was inconsistent with the teaching of *Miranda* to permit the investigator to testify concerning anything said in the course of either interview and that the trial court further erred in permitting the Government to introduce into evidence the signed statement and the shipping records. The argument is unpersuasive.

In *Miranda*, supra, the Supreme Court addressed itself to a specific problem: The dangers that attend police-dominated custodial interrogations.[4] Recognizing the "potentiality of compulsion" inherent in any "in-custody" questioning, the Court sought to safeguard the right of a suspect "to remain silent unless [he] 'chooses to speak in the unfettered exercise of his own will.' Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)." *Miranda*, supra at 460, 86 S.Ct. at 1620. Admittedly the challenged testimony, the signed statement and the documents were highly incriminating and contributed substantially to Webb's conviction. Disputing the applicability of *Miranda*, the Government argues that at the time of the interviews, Webb was not the focus of a criminal investigation nor was he in custody.

As we understand ICC procedures, after a complaint is issued an agent is assigned to undertake an exploratory investigation. Information accumulated during this initial stage is compiled in

4. Custodial interrogation was defined by the Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." In a footnote appended to this passage, the Court added, "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." *Miranda*, supra at 444, 86 S.Ct. at 1612.

Report Form 36 which is forwarded to the agent's superior. A decision is then made whether to carry the investigation further. If it is decided to do so, the agent continues his investigation and submits his final report on Form 56. On the basis of this report, the Commission determines whether to institute an enforcement action.

■ Thus, at the time of the first interview, the investigation was in a preliminary stage. It cannot be said that any criminal action was then anticipated. Waldron's testimony relating to statements made by Webb during that interview was properly admitted.

■ Webb further complains of the admission of certain documents surrendered by the appellant during the initial interview. It is to be noted, however, that all records sought to be excluded by appellant were mandatorily kept pursuant to the regulatory scheme of the Motor Carrier Act. 49 U.S.C. § 320(d). That Congress has the power to require the keeping of records as a means of enforcing a statutory program was settled by the Supreme Court in Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L. Ed. 1787 (1948). In that case, the Court held that records kept in obedience to a legitimate regulation are deemed to be public "non-privileged" documents that can be subpoenaed by a court of law without infringing the record keeper's Fifth Amendment right against self-incrimination. See Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L. Ed. 771 (1911); Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913); Davis v. United States, 328 U.S. 582, 589–590, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); Curcio v. United States, 354 U.S. 118, 124, 77 S.Ct. 1145, 1 L.Ed. 2d 1225 (1957). It would be anomalous to hold that a court may command the production of these quasi-public records, but that their admission could then be defeated by a showing that the government agent failed to inform the defendant of his constitutional rights, particularly the right against self-incrimination

which the Supreme Court held in *Shapiro* does not attach.

The cases cited above have not been affected by the recent Supreme Court pronouncements in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed. 2d 889 (1968), Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) or Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). As the Court specifically observed in *Marchetti*, supra, 390 U.S. at 56, 88 S.Ct. at 706, "neither *Shapiro* nor the cases upon which it relied are applicable here." Without attempting to delimit the Government's power to require the keeping of records, the Court noted that "[e]ach of the three principal elements of the [Shapiro] doctrine * * is absent from this situation." However, unlike the *Marchetti, Grosso* and *Haynes* cases, we find in the instant case all three of the enumerated elements. First, Webb was "obliged to keep and preserve records 'of the same kind as he has customarily kept.'" Secondly, there are important "public aspects" to the records required by the Motor Carrier Act, namely the regulation of interstate trucking. Finally, and perhaps most significantly, "the requirements at issue * * * [are] imposed in 'an essentially non-criminal and regulatory area of inquiry'" and are not directed to a "'selective group inherently suspect of criminal activity.' Cf. Albertson v. SACB, 382 U.S. 70, 79, 86 S.Ct. 194, 15 L.Ed.2d 165." *Marchetti*, supra, 390 U.S. at 57, 88 S.Ct. at 707.

■ Concluding that the trial court properly received testimony concerning the investigator's initial interview with Webb and properly admitted the documents obtained at that time, we must still decide whether the statement signed by Webb without the benefits of the *Miranda* warnings was erroneously admitted into evidence. Certainly, when agent Waldron returned with the prepared statement the prospect of legal action, especially if Webb signed, was more than a remote possibility. In holding, however, that this aspect of the

investigation also falls without the scope of *Miranda*, we rely on two factors. First, Part II of the Interstate Commerce Act [originally the Motor Carrier Act] is primarily regulatory in purpose and judicial proceedings brought thereunder are "essentially non-criminal" in nature.[5] Although the violation of a particular provision, such as is shown to have occurred in this case, may lead to a criminal prosecution, the charge would be a misdemeanor carrying a maximum penalty of $500 for each offense. 49 U.S.C. § 322 (a).[6] After the commencement of the investigation in this case, Congress amended the Act to permit the Commission to proceed against a violator by a civil forfeiture action carrying precisely the same penalties. 49 U.S.C. § 322(h). Under no conceivable circumstances could Webb have been incarcerated. Nor do we detect any difference in result whether an action is brought under subsection (a) or under subsection (h). In neither case would Webb be subjected to an automatic revocation of his certification, and, in fact, we were assured during oral argument that it is unlikely in either case that the Commission would initiate a revocation action.

Secondly, Webb was not the subject of a "custodial interrogation" at any time during this investigation. He was never "in custody." In fact all questioning took place in his own office, often in the presence of his secretary, and by a single ICC agent without the power to arrest or detain him. The interrogation was of brief duration and there is not the slightest hint of any overbearing, threat, trickery or deception on the agent's part. When presented with the prepared statement, Webb was told that he did not have to sign. Although he took the stand in his own defense, his testimony in no way controverted the ICC agent's version.

The fact that appellant was never "in custody" serves to distinguish this case from the Supreme Court's recent decision in Mathis v. United States, 391 U.S. 1 (1968), 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). There, the issue was whether the subject of a tax investigation, then in jail serving a state sentence, was entitled to the *Miranda* warnings. Statements elicited during the interrogation, conducted in the Florida State Penitentiary, led to petitioner's conviction for knowingly filing false claims against the Government and to a sentence of thirty months' imprisonment on each of two counts. The Court rejected the Government's contention that *Miranda* did not apply and refused to depart "from the well-considered conclusions of *Miranda* with reference to warnings to be given to *a person held in custody*." (Emphasis added.) 88 S.Ct. at 1505.[7] No such departure is sought in the instant case. Rather, the question is whether to extend the *Miranda* doctrine to this non-custodial interrogation which was not actually or potentially coercive or intimidating.

We do not interpret the *Miranda* mandate so broadly as to include these circumstances. To equate them to a *Miranda* situation would be to ignore the language and the underlying concept of the Court's opinion.

Additionally, Webb contends that the Government failed to prove (a) that the challenged leases were invalid and

---

5. Enacted to promote the national transportation policies, the Interstate Commerce Act opens with the statement, "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act * * *. All of the provisions of this Act * * * shall be administered and enforced with a view to carrying out the above policy." Title 49 of U.S.C.A. preceding § 1.

6. Among the numerous errors alleged, Webb attacked the $500 penalty assessed by the trial judge as "unduly harsh." In rejecting this contention, we note that the amount of the fine is, of course, within the province of the trial court. Convicted on all seven counts, Webb received a suspended sentence on two and was fined the statutory minimum of $100 on each of the remaining counts.

7. See White v. United States, 395 F.2d 170 (8 Cir. 1968).

(b) that the hauls allegedly undertaken by Dunn were, as required by the statute, "for hire." The first contention misses the gravamen of the offense. The validity of the type of lease employed in this case is not in issue. The Government's theory is that the parties did not abide by the lease; that Webb in fact failed to exercise any control over the operation of Dunn's vehicles; and that the lease was a mere subterfuge whereby Dunn illegally engaged in interstate hauling. There is ample support in the evidence for the Government's position.

As to the second contention, the defendant denied having paid Dunn for any of the hauls. It is clear, however, both parties expected payment to be made, as the lease agreements provided, and we are in accord with the District Judge's ruling that the expectation of payment will suffice. See Schenley Distillers Corp. v. United States, 61 F.Supp. 981, 987 (Del. 1945), aff'd, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1946); Shippers Cooperative, Inc., et al. v. I. C. C., 308 F.2d 888, 892 (9 Cir. 1962).

Webb next maintains that the trial court erred when, on its own initiative, it reopened the case to allow the Government to introduce evidence of a prior similar offense. The Government had, earlier in the trial, offered in evidence a letter from the ICC to Webb reprimanding him for entering into an arrangement similar to the one in this case. The Judge, acting under the assumption that intent was not a necessary element of the offense charged, excluded the letter. When, however, in his summation to the court sitting without a jury, Webb argued that the Government had failed to show that he had entered into the agreement with knowledge of its illegality, the trial judge reversed his initial ruling, reopened the case and permitted the introduction of the letter. This action was clearly within his sound discretion.

We find no merit in any of defendant's contentions, and the judgment of the District Court is

Affirmed.