PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-4267

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

UNDER SEAL,

                    Defendant - Appellant.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.   Leonie M. Brinkema,
District Judge. (1:12-dm-00020-LMB-1)

Argued: October 29, 2013          Decided: December 13, 2013

Before KING, GREGORY, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in
which Judge King and Judge Gregory joined.

**ARGUED:** Caroline Rule, KOSTELANETZ & FINK, LLP, New York, New
York, for Appellant.    Elissa Hart-Mahan, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON
BRIEF:** Robert Steven Fink, Juliet Leah Fink, KOSTELANETZ & FINK,
LLP, New York, New York; David G. Barger, GREENBERG TRAURIG,
LLP, McLean, Virginia, for Appellant.  Neil H. MacBride, United
States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Alexandria, Virginia; Kathryn Keneally, Assistant Attorney
General, Frank P. Cihlar, Chief, Criminal Appeals & Tax
Enforcement Policy Section, Gregory Victor Davis, Tax Division,

UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————

AGEE, Circuit Judge:

John and Jane Doe (the "Does") appeal the district court's order holding them in civil contempt for refusing to comply with grand jury subpoenas. The Does contend that the district court erred in finding that the required records doctrine overrode their Fifth Amendment privilege against self-incrimination and required production of certain foreign bank records. For the reasons that follow, we affirm the judgment of the district court.

I.

The underlying facts in this case are undisputed. The Does are the targets of a grand jury investigation in the United States District Court for the Eastern District of Virginia seeking to determine whether they used secret Swiss bank accounts to conceal assets and income from the Internal Revenue Service ("IRS") and the Treasury Department. The grand jury received evidence that on June 2, 2008, John Doe opened an account at the Swiss investment bank Clariden Leu (now Credit Suisse AG) in the name of [Redacted Corporation]. He was the beneficial owner of the account, which was valued in excess of $2.3 million at the close of 2008. The account was managed by the Swiss firm Beck Verwaltungen AG. When John Doe closed this account in January 2009, he transferred $1.5 million to Beck

3

Verwaltungen AG's account at a different Swiss private bank, Bank Sarasin.

On May 18, 2012, the Does were served grand jury subpoenas requesting that they produce certain foreign bank account records that they were required to keep pursuant to Treasury Department regulations governing offshore banking. The subpoenas demanded production of

> [a]ny and all records required to be maintained pursuant to 31 C.F.R. § 1010.420 (formerly 31 C.F.R. § 103.32) for the past five (5) years relating to foreign financial bank, securities, or other financial accounts in a foreign country for which you had/have a financial interest in, or signature or other authority over and are required by law to file a Report of Foreign Bank and Financial Account (FBAR). The records required to be maintained pursuant to 31 C.F.R. § 1010.420 (formerly 31 C.F.R. § 103.32) include records that contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period.

(J.A. 10.) The Does timely moved to quash the subpoenas, citing their Fifth Amendment privilege against self-incrimination. The Government opposed the motion, arguing that under the required records doctrine, the privilege does not apply to financial records that the Does were required by law to retain.

4

After hearing argument, the district court denied the Does' motion to quash, finding that the required records doctrine overrode their Fifth Amendment privilege against self-incrimination, and ordered them to comply with the subpoenas. The Does refused to comply, and pursuant to a stipulation by the parties, the district court held the Does in civil contempt.[1]

The Does now appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

A.

We review the district court's denial of a motion to quash a subpoena for an abuse of discretion.[2] In re Grand Jury Subpoena: John Doe, No. 05GJ1318, 584 F.3d 175, 182 (4th Cir. 2009). But "[i]nsofar as the district court's determination was based upon interpretations of law, . . . we review those conclusions de novo." In re Grand Jury Subpoena (T-112), 597 F.3d 189, 195 (4th Cir. 2010).

---

[1] The district court stayed the execution of the contempt order until this Court adjudicates the Does' appeal.

[2] Although the Does formally appeal the district court's order holding them in civil contempt, the underlying basis of the contempt order is the court's denial of their motion to quash the grand jury subpoenas.

B.

The Bank Secrecy Act (the "BSA" or the "Act"), 31 U.S.C. §§ 5311-25, regulates offshore banking and contains a number of recordkeeping and inspection provisions. Among the purposes of the BSA is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. Section 241(a) of the Act instructs the Treasury Secretary to "require a resident or citizen of the United States . . . to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction . . . with a foreign financial agency." Id. § 5314(a). In furtherance of that statutory directive, the Treasury Secretary implemented regulations that require (1) U.S. citizens and residents to disclose their foreign bank accounts, see 31 C.F.R. § 1010.350, and (2) that the records for such accounts "be retained by each person having a financial interest in or signature or other authority over any such account" for at least five years and be kept "at all times available for inspection as authorized by law," id. § 1010.420. These recordkeeping regulations were in effect at all times relevant to this case.

6

III.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has held that the privilege against self-incrimination bars the government from "compelling a person to give 'testimony' that incriminates him." Fisher v. United States, 425 U.S. 391, 409 (1976). Because "the privilege protects a person only against being incriminated by his own compelled testimonial communications," the Court has determined that it does not shield production of private papers voluntarily prepared or prepared by a third party. Id. at 409.

The Does contend that the required records doctrine—which, if it applies, renders the Fifth Amendment privilege inapplicable—does not apply here and that the district court erred in finding otherwise. Essentially, the Does argue that "[w]here documents are required to be kept and then produced, they are arguably compelled." In re M.H., 648 F.3d 1067, 1071 (9th Cir. 2011) (emphasis in original). The Supreme Court, however, has held that the privilege against self-incrimination does not bar the government from imposing recordkeeping and inspection requirements as part of a valid regulatory scheme. See Shapiro v. United States, 335 U.S. 1, 17 (1948) (noting that the nature of documents and the capacity in which they are held

7

may indicate that "the custodian has voluntarily assumed a duty which overrides his claim of privilege").

In Shapiro, the Court required a wholesaler of fruit and produce to turn over certain records he was obliged to keep and maintain for examination pursuant to the Emergency Price Control Act ("EPCA"), which was enacted during World War II to prevent inflation and price gouging. Id. at 4-11. The Court determined that the EPCA represented a valid exercise of Congress' regulatory authority and that the recordkeeping provisions of the EPCA were essential to the administration of the statute's objectives. Id. at 31-32. Further, the Court reasoned that this "required records doctrine" applies "not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." Id. at 17 (emphasis omitted).

The Court revisited its decision in Shapiro twenty years later in Marchetti v. United States, 390 U.S. 39 (1968) and Grosso v. United States, 390 U.S. 62 (1968). In holding that the required records doctrine was inapplicable to the circumstances before it in both cases, the Court articulated three requirements—derived from Shapiro's holding—for determining the applicability of the required records doctrine.

8

As summarized in <u>Grosso</u>, those requirements are: (1) the purposes of the United States' inquiry must be essentially regulatory; (2) information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and (3) the records themselves must have assumed public aspects which render them at least analogous to a public document.  390 U.S. at 67–68.

This Court has recognized that the foregoing three principles announced in <u>Grosso</u> define the required records doctrine, <u>see, e.g.</u>, <u>United States v. Webb</u>, 398 F.2d 553, 556 (4th Cir. 1968) (recognizing required records doctrine in context of regulation of interstate trucking), but has yet to address the applicability of the doctrine in the context of foreign bank records.  We do so now and join the consensus of the courts of appeals to have considered the issue that the required records doctrine applies in concluding that records required to be maintained under the BSA fall within the required records doctrine.[3]  We further conclude that all three requirements of the doctrine are met in this case.

---

[3] <u>See, e.g.</u>, <u>In re Grand Jury Subpoena</u>, 696 F.3d 428, 433–34 (5th Cir. 2012); <u>In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011</u>, 691 F.3d 903, 909 (7th Cir. 2012); <u>In re M.H.</u>, 648 F.3d at 1073; <u>In re Doe</u>, 711 F.2d 1187, 1191 (2d Cir. 1983).

A.

In order to fall under the required records doctrine, the purpose of the recordkeeping must be "essentially regulatory." Grosso, 390 U.S. at 68. We have held that a recordkeeping requirement is "essentially regulatory" if it is "imposed in an essentially noncriminal and regulatory area of inquiry and [is] not directed to a selective group inherently suspect of criminal activity." Webb, 398 F.2d at 556 (internal quotation marks omitted).

The Does argue that, for several reasons, the BSA's recordkeeping provision is criminal in nature, rather than regulatory. They contend that unlike truly regulatory schemes, such as those that condition employment or licensure on the retention of certain records, the BSA's purpose is prosecutorial—i.e., to grant law enforcement access to otherwise unavailable evidence of foreign financial transactions. The Does cite language referring to criminal investigation as one of the BSA's aims in the statute's declaration of purpose, legislative history, and descriptions on the IRS website, to support their position that the BSA's recordkeeping requirements prohibitively operate in a criminal area of inquiry against those suspected of tax fraud. Implicit in the Does' argument is that because the BSA lists first among its purposes the gathering of information that has "a high degree of usefulness

10

in criminal . . . investigations," 31 U.S.C. § 5311, the Act's chief purpose is to fight crime.

These same arguments failed to persuade the other appellate courts which have considered the issue, and do not persuade us either. See, e.g., In re M.H., 648 F.3d at 1073–74 (noting and rejecting party's citations to language in the BSA and the IRS website); In re Grand Jury Subpoena, 696 F.3d at 434–35 (same).

The Supreme Court has observed that a statute which includes a criminal law purpose in addition to civil regulatory matters does not strip the statute of its status as "essentially regulatory." See Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 77 (1974) ("[T]hat a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it."). Notwithstanding their own argument, the Does acknowledge that the BSA has purposes unrelated to criminal investigation. The plain language of the BSA verifies its concomitant tax, regulatory, and counterterrorism purposes in addition to its law enforcement goals. See 31 U.S.C. § 5311 (requiring records to be kept "where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism" (emphasis added)). Elaborating on the non-criminal

11

purposes of the BSA, the relevant House Report acknowledges that the Act's recordkeeping and reporting requirements "aid duly constituted authorities in lawful investigations" but also underscores that the requirements "facilitate the supervision of financial institutions properly subject to federal supervision" and "provide for the collection of statistics necessary for the formulation of monetary and economic policy." H.R. Rep. No. 91-975 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4405. Consequently, the Treasury Department shares the information it collects pursuant to the requirements of the BSA with other agencies—including the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of Thrift Supervision—none of which are empowered to bring criminal prosecutions. See 31 U.S.C. § 5319; 31 C.F.R. § 1010.950(a)-(b).

Further, the Supreme Court has noted, in discussing "the recordkeeping and reporting requirements of the [BSA]," that "Congress seems to have been equally concerned with civil liability which might go undetected by reason of transactions of the type required to be recorded or reported." Schultz, 416 U.S. at 76. Indeed, the BSA's comprehensive statutory scheme contains recordkeeping requirements that carry both civil and

12

criminal penalties.  See 31 U.S.C. §§ 5321, 5322 (individual's failure to report or retain required records of foreign bank accounts does not give rise to criminal liability unless that failure is proven "willful").[4]

Additionally, the BSA's recordkeeping requirements broadly cover all those who maintain foreign bank accounts, rather then a particular subgroup.  The Ninth Circuit has explained:

> There is nothing inherently illegal about having or being a beneficiary of an offshore foreign banking account.  According to the Government, § 1010.420 applies to "hundreds of thousands of foreign bank accounts—over half a million in 2009."  Nothing about having a foreign bank account on its own suggests a person is engaged in illegal activity.  The fact distinguishes this case from Marchetti and Grosso, where the activity being regulated—gambling—was almost universally illegal, so that paying a tax on gambling wagers necessarily implicated a person in criminal activity.  Admitting to having a foreign bank account carries no such risk.  That the information contained in the required record may ultimately lead to criminal charges does not convert an essentially regulatory regulation into a criminal one.

In re M.H., 648 F.3d at 1074–75.

Moreover, § 1010.420 has a reporting requirement.  The regulation mandates that the required records "shall be kept at all times available for inspection as authorized by law."  31

---

[4] 31 U.S.C. § 5321 permits the Secretary of Treasury to commence civil actions to recover monetary penalties for various violations of the BSA.

C.F.R. § 1010.420. The Supreme Court has indicated that "no meaningful difference" exists "between an obligation to maintain records for inspection, and such an obligation supplemented by a requirement that those records be filed periodically with officers of the United States." Marchetti, 390 U.S. at 56 n.14.

Because the BSA's recordkeeping requirements serve purposes unrelated to criminal law enforcement and the provisions do not apply exclusively to those engaged in criminal activity, we find that those requirements are "essentially regulatory." Accordingly, we conclude that the first prong of the required records doctrine is satisfied.

B.

The records must also be "of a kind which the regulated party has customarily kept." Grosso, 390 U.S. at 68. We find this prong of the required records doctrine to be easily satisfied here. The records sought are of the same type that the Does must report annually to the IRS pursuant to the regulation of offshore banking: the name, number, and type of account(s), the name and address of the bank where an account is held, and the maximum value of the account during the reporting period. See 31 C.F.R. §§ 1010.350, 1010.420.

Furthermore, the records sought are also of the same type that a reasonable account holder, foreign or domestic, would

14

keep in order to access his or her account. See In re M.H., 638 F.3d at 1076 (reasoning that foreign account holders routinely retain basic foreign bank records if only to access their own accounts). The Does argue that individuals are unlikely to keep account records for the five years required under 31 C.F.R. § 1010.420, given the three-year statute of limitations for civil tax adjustments, and because foreign banks are notorious for failing to provide customers with records. This argument fails, however, given the clear language in § 1010.420 that requires the retention of the account information that has been subpoenaed.[5] Because it is the failure to maintain such records that can be probative of criminal activity, rather than the contents of the records, foreign account holders can reasonably be expected to follow the law governing their choice to engage in offshore banking.

Accordingly, we conclude that the records sought are of a kind "customarily kept" and the second prong of the required records doctrine is satisfied.

---

[5] We also find the Does' five-year argument dubious in view of 26 U.S.C. § 6501(e), which contains a six-year statute of limitations for many taxpayers and fosters a generally accepted accounting practice to advise taxpayers to keep their pertinent records until the § 6501(e) period has expired.

15

## C.

Finally, "the records [sought] must have assumed 'public aspects' which render them at least analogous to public documents." Grosso, 390 U.S. at 68. Two courts of appeals have held that "if the government's purpose in imposing the regulatory scheme is essentially regulatory, then it necessarily has some 'public aspects'" sufficient to satisfy the third prong of the required records doctrine. In re M.H., 638 F.3d at 1076 (citing Shapiro, 335 U.S. at 33); accord Donovan v. Mehlenbacher, 652 F.2d 228, 231 (2d Cir. 1981). For purposes of this case, we agree.

Drawing a distinction between entities and individuals who publicly engage in business with the public and those who privately open a foreign bank account, the Does contend that there is "nothing public about the unlicensed private activity of owning a foreign bank account." (Appellant's Br. 49.) The Does argue that the subpoenaed records are private, personal financial records which are unrelated to legitimate regulatory goals.

This argument by the Does misapprehends this prong of the required records doctrine by conflating "public aspects" and "public access." Although the Does argue that substantive regulations designed to protect the public from harm and open to public access may imbue otherwise private documents with public

16

aspects, it does not follow that public aspects exist only under these circumstances. That the records sought are typically considered private does not bar them from possessing the requisite public aspects. See In re M.H., 648 F.3d at 1077 ("[T]hat the information sought is traditionally private and personal as opposed to business-related does not automatically implicate the Fifth Amendment."); In re Kenny, 715 F.2d 51, 52–54 (2d Cir. 1983) (reasoning that subpoenaed medical records possessed sufficient "public aspects" to satisfy the third prong of the required records doctrine). As discussed above, the Treasury Department shares the information it collects pursuant to the Act's recordkeeping and reporting requirements with a number of other agencies. See 31 U.S.C. § 5319; 31 C.F.R. § 1010.950(a)-(b). This data sharing is designed to serve important public purposes, including the formation of economic, monetary, and regulatory policy, any of which are more than sufficient to imbue otherwise private foreign bank account records with "public aspects." See In re Grand Jury Subpoena, 696 F.3d at 436.

Finally, the Does contend that a requirement to retain records begets a more attenuated relationship with the government than a requirement to report their contents, such that documents maintained under a mere recordkeeping requirement have insufficient "public aspects." The Supreme Court, however,

17

has squarely rejected this proposition. See Marchetti, 390 U.S. at 56 n.14 ("We perceive no meaningful difference between an obligation to maintain records for inspection, and such an obligation supplemented by a requirement that those records be filed periodically with officers of the United States."). We therefore conclude that the records in question have "public aspects" sufficient to satisfy the third prong of the required records doctrine.

IV.

Because we find that the records sought in the grand jury subpoenas meet all the requirements of the required records doctrine, the Fifth Amendment privilege is inapplicable, and the Does may not invoke it to shield themselves from the subpoenas' commands. As the Does' Fifth Amendment privilege is not implicated, we need not address their request for immunity. Accordingly, the judgment of the district court is

AFFIRMED.