# United States Court of Appeals
## For the First Circuit

No. 14-2003

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

ZHONG H. CHEN,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter,* Associate Justice,
and Stahl, Circuit Judge.

William J. Lovett, with whom Melissa S. Baldwin and Collora
LLP were on brief, for appellant.
Alexander P. Robbins, Attorney, Tax Division, Department of
Justice, with whom Robert J. Branman, Attorney, Tax Division,
Department of Justice, Caroline D. Ciraolo, Acting Assistant
Attorney General, Diana L. Erbsen, Deputy Assistant Attorney
General, Gilbert S. Rothenberg, Robert W. Metzler, Attorneys, Tax
Division, Department of Justice, and Carmen M. Ortiz, United States
Attorney, were on brief, for appellee.

---

      *     Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

February 29, 2016

**LYNCH**, **Circuit Judge**. Tensions between taxpayers and the Internal Revenue Service ("IRS") over forced disclosure of foreign bank account information implicate both statutory and constitutional rights. Taxpayers have Fifth Amendment rights not to be forced to incriminate themselves by the compelled act of production. But where the documents are required to be kept under the regulatory scheme of the Bank Secrecy Act ("BSA" or "the Act"), see Currency and Foreign Transactions Reporting Act, Pub. L. No. 91-508, tit. II, 84 Stat. 1118 (1970) (codified as amended at 31 U.S.C. § 5311 et seq.), the question arises whether the Required Records Doctrine under the Fifth Amendment trumps those Fifth Amendment rights. The Supreme Court has not directly answered this question.

We now join the unanimous view of the circuit courts that have faced the question, all of which hold that the taxpayer must comply with an IRS summons for documents he or she is required to keep under the Act, where the IRS is investigating civilly the failure to pay taxes and the matter has not been referred for criminal prosecution. And so we affirm the district court's enforcement of the summons as to documents required to be kept under the BSA. See United States v. Chen, 952 F. Supp. 2d 321, 333 (D. Mass. 2013). As to enforcement of the summons for documents not subject to the BSA, we vacate and remand to the district court for further explanation.

- 3 -

I.

As part of an investigation into the 2008 tax liability of Zhong H. Chen and his wife, Chu H. Ng, the IRS served a summons on Chen on September 12, 2011, requiring him to appear for an interview with an IRS revenue agent and to produce various financial and banking records. Chen appeared for the interview, but he refused to answer any questions -- invoking the Fifth Amendment -- and did not provide the requested documents. On May 31, 2012, the government filed in the Massachusetts federal district court a petition to enforce the portion of the summons seeking the production of documents. In support of its petition, the government submitted an affidavit executed by an IRS revenue agent stating that "[i]t is necessary to obtain the records sought by the Summons in order to determine the federal tax liabilities of Chu H. Ng and Zhong H. Chen for the taxable period ending December 31, 2008." Importantly, it also stated that "[t]here is no 'Justice Department referral[]' . . . in effect with respect to Chu H. Ng and Zhong H. Chen for the year under examination."[1] In

_____

[1] This statement meant that the taxpayers were not then referred for criminal prosecution by the Department of Justice. "A Justice Department referral is in effect with respect to any person if -- (i) the Secretary has recommended to the Attorney General a grand jury investigation of, or the criminal prosecution of, such person for any offense connected with the administration or enforcement of the internal revenue laws, or (ii) any request is made under section 6103(h)(3)(B) for the disclosure of any return or return information (within the meaning of section 6103(b)) relating to such person." 26 U.S.C. § 7602(d)(2)(A).

response, Chen asserted a Fifth Amendment claim of privilege, not over the documents themselves, but over his compelled act of producing the documents. See Fisher v. United States, 425 U.S. 391, 410 (1976) (describing compelled act of production privilege); see also In re Grand Jury Subpoena (Mr. S.), 662 F.3d 65, 72-73 (1st Cir. 2011).

The district court granted, in part, the government's petition to enforce the summons on July 3, 2013. See Chen, 952 F. Supp. 2d at 334. It granted the petition "insofar as it relates to those documents implicated by the recordkeeping requirements of the Bank Secrecy Act" because it concluded that those documents fall within the scope of the Required Records Doctrine. Id. at 333. On September 11, 2014, after reviewing in camera the documents not covered by the BSA's recordkeeping provision, as well as an in camera argumentative submission in support of Chen's privilege claim, the district court issued a brief order directing Chen, without explanation, also to produce the documents not covered by the BSA. This appeal followed.[2]

## II.

Our holding requires an understanding of the Bank Secrecy Act and its purposes.

---

[2] We need not address the contempt issue raised in Chen's original brief because that issue has since been disposed of. See Judgment, United States v. Chen, No. 14-2339 (1st Cir. Nov. 2, 2015).

The BSA was first enacted in 1970. Its preamble states its four purposes as follows: "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism."[3] 31 U.S.C. § 5311. Enforcement of criminal laws is a direct purpose, but not the sole purpose.

The Act requires individuals engaged in foreign banking to maintain certain records:

> [T]he Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency.

Id. § 5314(a).

The Secretary of the Treasury has promulgated regulations specifying reporting and recordkeeping requirements. The reporting requirement provides:

> Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such

---

[3] The phrase "or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism" was added in 2001 by the USA PATRIOT Act, Pub. L. No. 107-56, § 358(a), 115 Stat. 272, 326 (2001).

- 6 -

> relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons.

31 C.F.R. § 1010.350(a).  Those individuals who are subject to the § 1010.350 reporting requirement are also subject to recordkeeping requirements:

> Records of accounts required by § 1010.350 to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account.  Such records shall contain [1] the name in which each such account is maintained, [2] the number or other designation of such account, [3] the name and address of the foreign bank or other person with whom such account is maintained, [4] the type of such account, and [5] the maximum value of each such account during the reporting period.  Such records shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law.

Id. § 1010.420.  This recordkeeping regulation is at the heart of this appeal.

Congress, when it adopted the BSA, was deeply concerned about the proliferation of white-collar criminals using secret foreign bank accounts, and Congress emphasized the benefits that the reporting and recordkeeping requirements of the BSA would have for criminal investigations.  The Senate Committee on Banking and Currency noted that "[t]estimony before the committee and other evidence indicates that secret foreign bank accounts have been put

- 7 -

to a number of illegal purposes." S. Rep. No. 91-1139, at 3 (1970). It stated that "[t]he purpose of the bill is to provide law enforcement authorities with greater evidence of financial transactions in order to reduce the incidence of white-collar crime." Id. at 1; see id. at 1-4, 8-9; H.R. Rep. No. 91-975, at 10, 12-13, 19-20 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4395, 4397-98, 4404. Nonetheless, rooting out criminal activity was not Congress's only interest, and the justifications for the BSA's reporting and recordkeeping requirements extend far beyond the criminal context. Merely looking at the text of the statute proves that its purposes are diverse. The text itself points to the utility of the required records in the tax, regulatory, and counterterrorism contexts. See 31 U.S.C. § 5311. And to the extent one looks at legislative history, it confirms this view.

The Supreme Court, in reviewing a series of constitutional challenges to the BSA, stated that while "concern for the enforcement of the criminal law was undoubtedly prominent in the minds of the legislators who considered the Act," "Congress seems to have been equally concerned with civil liability which might go undetected by reason of transactions of the type required to be recorded or reported." California Bankers Ass'n v. Shultz, 416 U.S. 21, 76-77 (1974). Indeed, the Court emphasized that "the fact that a legislative enactment manifests a concern for the

- 8 -

enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it."  Id. at 77.[4]

The BSA manifestly has non-criminal purposes.  A properly functioning system of foreign commerce cannot operate without reporting and recordkeeping of the kind mandated by the BSA and its implementing regulations.  As the House Report explains:

> The debilitating effects of the use of . . . secret institutions [in foreign jurisdictions] on Americans and the American economy are vast.  It has been estimated that hundreds of millions in tax revenues have been lost.  Unwarranted and unwanted credit is being pumped into our markets.  There have been some cases of corporation directors, officers and employees who, through deceit and violation of law, enriched themselves or endangered the financial soundness of their companies to the detriment of their stockholders. . . .
>
> One of the most damaging effects of an American's use of secret foreign financial facilities is its undermining of the fairness of our tax laws.  Secret foreign financial facilities, particularly in Switzerland, are available only to the wealthy. . . . [I]t is grossly unfair to leave the secret foreign bank account open as a convenient avenue of tax evasion.

---

[4]  While the plaintiffs in Shultz had brought a Fifth Amendment self-incrimination challenge to the foreign reporting requirements in the BSA, the Court did not reach the merits of the issue and dismissed their claims as premature.  See Shultz, 416 U.S. at 71–75.

H.R. Rep. No. 91-975, at 12–13, reprinted in 1970 U.S.C.C.A.N. at 4397–98.[5]

To that end, information collected pursuant to the BSA's reporting and recordkeeping requirements is shared with other agencies, "including the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of Thrift Supervision." United States v. Under Seal, 737 F.3d 330, 335 (4th Cir. 2013); see 31 U.S.C. § 5319 (requiring the Secretary of the Treasury to "make information in a report filed under this subchapter available to an agency, including any State financial institutions supervisory agency, United States intelligence agency or self-regulatory organization registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission, upon request of the head of the agency or organization"); 31 C.F.R. § 1010.950.

Congress was keenly aware that it cannot "abridge or challenge the right of any country to follow its own banking

---

[5] The House Report also notes that while the reporting and recordkeeping requirements help "aid duly constituted authorities in lawful investigations," they also "facilitate the supervision of financial institutions properly subject to Federal supervision," and "provide for the collection of statistics necessary for the formulation of monetary and economic policy." H.R. Rep. No. 91-975, at 20, reprinted in 1970 U.S.C.C.A.N. at 4405.

practices," and that it "cannot legitimately expect its laws to be given extraterritorial application when they conflict with the laws of another country."  S. Rep. No. 91-1139, at 3.  Some diplomatic channels exist to assist the government in obtaining foreign bank records, such as letters rogatory or mutual legal assistance treaties, but in the face of foreign bank secrecy laws, these processes are lengthy, cumbersome, and far from foolproof. See Shultz, 416 U.S. at 29 (noting that efforts to obtain information from foreign banks are subject to "time consuming and ofttimes fruitless foreign legal process" (quoting H.R. Rep. No. 91-975, at 12, reprinted in 1970 U.S.C.C.A.N. at 4397)).

Accordingly, "Congress enacted the BSA so as to ameliorate the difficulties and challenges associated with obtaining records by means of a foreign treaty."  In re Grand Jury Subpoena Dated Feb. 2, 2012, 908 F. Supp. 2d 348, 357 (E.D.N.Y. 2012), aff'd, 741 F.3d 339 (2d Cir. 2013).  It was reasonable for Congress, faced with these obstacles, to impose reporting and recordkeeping requirements on United States citizens and residents engaged in foreign banking.  "[T]he United States can legitimately require its own citizens or financial institutions to keep records and file reports on transactions with foreign financial institutions and that is the approach taken by the bill."  S. Rep. No. 91-1139, at 3.  The BSA's recordkeeping provision and its implementing regulation are "central to the legislative scheme in

- 11 -

that compliance with [them] furnishes the government with the information necessary to effective regulation." Varitimos v. United States, 404 F.2d 1030, 1032 n.4 (1st Cir. 1968) (emphasis added).

## III.

There is extensive discussion elsewhere in the case law as to the evolution of the law of Fifth Amendment privilege and why Chen's Fifth Amendment claim fails, which we need not articulate again. We agree with seven of our sister circuits that the claim fails on the grounds that BSA records are subject to the Required Records Doctrine. See United States v. Chabot, 793 F.3d 338 (3d Cir.), cert. denied, 136 S. Ct. 559 (2015); In re Grand Jury Subpoena Dated Feb. 2, 2012, 741 F.3d 339 (2d Cir. 2013); United States v. Under Seal, 737 F.3d 330 (4th Cir. 2013); In re Grand Jury Proceedings, No. 4-10, 707 F.3d 1262 (11th Cir.), cert. denied, 134 S. Ct. 129 (2013); In re Grand Jury Subpoena, 696 F.3d 428 (5th Cir. 2012); In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d 903 (7th Cir. 2012), cert. denied, 133 S. Ct. 2338 (2013); In re Grand Jury Investigation M.H., 648 F.3d 1067 (9th Cir. 2011), cert. denied, 133 S. Ct. 26 (2012).

The Required Records Doctrine prevents an individual from resisting, in the name of the Fifth Amendment, the production of records whose creation and maintenance is required as a condition of voluntarily engaging in a highly regulated activity.

- 12 -

See Baltimore City Dep't of Soc. Servs. v. Bouknight, 493 U.S. 549, 556 (1990); see also In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d at 908-09. In a nutshell, it is commonly accepted that courts should apply the following three-part test for determining whether the Required Records Doctrine applies to a particular recordkeeping scheme. "[F]irst, the purposes of the United States' inquiry must be essentially regulatory[.]"[6] Grosso v. United States, 390 U.S. 62, 67-68 (1968) (citing Shapiro v. United States, 335 U.S. 1 (1948)). "[S]econd, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept[.]" Id. at 68. "[T]hird, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents." Id.; see Marchetti v. United States, 390 U.S. 39, 56-57 (1968).[7]

---

[6]    We agree with the United States that it mischaracterizes the inquiry to say it is a matter of ascertaining the hypothetical subjective "intent" of Congress.  Instead, the focus is on the nature of the underlying activity.  See Grosso v. United States, 390 U.S. 62, 68 (1968).

[7]    Chen questions whether this test is relevant to an act-of-production privilege claim, noting that the Required Records Doctrine was developed before the Supreme Court recognized the act-of-production privilege in Fisher, 425 U.S. at 410.  This argument is foreclosed by Supreme Court precedent.  In 1990, well after both lines of doctrine had been developed, the Supreme Court applied the Required Records Doctrine to an act-of-production privilege claim asserted by a mother, acting as custodian of her child pursuant to court order, who was resisting an order of a juvenile court to produce the child.  Bouknight, 493 U.S. at 551,

- 13 -

The government presents the analysis as occurring within two distinct analytical steps. First, the initial question is whether the government is authorized to regulate the activity in question, as the doctrine was originally articulated by the Supreme Court in Shapiro. There is no doubt that is true here. See U.S. Const. art. 1, § 8, cl. 3 (granting Congress power "[t]o regulate commerce with foreign nations"); Shultz, 416 U.S. at 59. But second, the government recognizes that the Court later narrowed the doctrine in three criminal cases, where the government was targeting activity that is criminal or almost always criminal. See Haynes v. United States, 390 U.S. 85, 95–100 (1968); Grosso, 390 U.S. at 64–69; Marchetti, 390 U.S. at 55–57. Chen unsuccessfully tries to fit himself into the limitations set by those cases. The government correctly does not contend that just because it has the power to regulate in an area that it also has the power to compel disclosure of required records. It acknowledges that it is not taking the position that it can simply criminalize an act and require records to be kept, which would indicate performance or non-performance of that criminal act, and that the records would then be admissible over a Fifth Amendment objection. The government also agrees that it could not by statute regulate an activity that is essentially or almost entirely

554–61.

- 14 -

criminal, mandate recordkeeping conditions on the activity, tell the criminal to self-report, and then prosecute him for failing to do so.  Neither situation is occurring here.

By contrast, Chen's keeping an offshore bank account is not inherently criminal.  The focus of the Required Records Doctrine is on "the characteristics of the activities about which information is sought" and "the composition of the group to which the inquiries are made." Grosso, 390 U.S. at 68.  Offshore banking clearly has inherently civil aspects, and one can comply with the Act's recordkeeping requirement without being a criminal.  In fact, the Act covers a great many people who are not engaged in any criminal activity.  Simply put, the Act cannot fairly be viewed as a backdoor attempt to get at a selected group engaged in illegal activities, through recordkeeping requirements and disclosure, for criminal prosecution.  Compare Haynes, 390 U.S. at 95-97, with Varitimos, 404 F.2d at 1033-34.

To be sure, Congress contemplated that the records required to be kept under the BSA would be useful in criminal prosecutions.  Any fair reading of the legislative history reveals as much.  But "[w]hile Congress clearly intended the Act's disclosure requirements to be of some use in criminal proceedings, we regard [the] non-prosecutorial interests as substantial." United States v. Dichne, 612 F.2d 632, 640 (2d Cir. 1979) (upholding, over a Fifth Amendment challenge, a requirement under

the BSA that individuals "report[] . . . the transportation of over $5,000 in monetary instruments into or out of the United States," id. at 639; see 31 U.S.C. § 5316 (previously codified at 31 U.S.C. § 1101) (now applicable to transportation of over $10,000 in monetary instruments)).

Chen maintains, however, that despite the Act's civil applications, compliance with its recordkeeping provision has "criminal implications." That may be so for some people covered by the Act, but "criminal implications" are not enough to render the Required Records Doctrine inapplicable. As Chief Justice Burger, writing for the plurality in California v. Byers, 402 U.S. 424 (1971), explained:

> An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours, and working conditions of employees. . . . Comparable examples are legion.
>
> In each of these situations there is some possibility of prosecution -- often a very real one -- for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. . . . But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.

Id. at 427-28 (plurality opinion) (footnote omitted).

This is not unusual. In fact, courts have relied on the Required Records Doctrine to uphold recordkeeping schemes imposed in a variety of contexts where disclosure carries a very real chance of "criminal implications." One prime example is in the securities regulation context. See SEC v. Fehn, 97 F.3d 1276, 1291-93 (9th Cir. 1996) (noting that "[a]lthough disclosure might have revealed past criminal violations in this case, the disclosure requirement does not, in general, mandate revelation of 'inherently illegal activity,'" id. at 1293 (quoting Bouknight, 493 U.S. at 557)); United States v. Stirling, 571 F.2d 708, 727-28 (2d Cir. 1978) (rejecting a similar Fifth Amendment self-incrimination claim against a securities disclosure requirement).

Other areas include the shipment and sale of firearms, see United States v. Flores, 753 F.2d 1499, 1500-04 (9th Cir. 1985) (en banc); United States v. Resnick, 488 F.2d 1165, 1168 (5th Cir. 1974) (noting that "the challenged laws sub judice [were] not directed at a highly selective group inherently suspect of criminal acts"); Varitimos, 404 F.2d at 1033-34; the transportation of articles into the United States, see United States v. Rios-Gonzalez, 450 F.2d 1213, 1216-17 (2d Cir. 1971) (noting that "the requirement that all articles be declared and the necessity of such a declaration shows that the appellant, and those in a similar position, were not singled out as a select group 'inherently suspect of criminal activities,'" id. at 1217 (quoting Albertson

- 17 -

v. <u>Subversive Activities Control Bd.</u>, 382 U.S. 70, 79 (1965)));
and the distillation and possession of alcohol, <u>see</u> <u>Henderson</u> v.
<u>Blackwell</u>, 436 F.2d 1081, 1082 (5th Cir. 1971) (per curiam) (citing
<u>Brown</u> v. <u>United States</u>, 401 F.2d 769 (5th Cir. 1968) (per curiam)).

In light of the limits that the government admits exist on the reach of the Required Records Doctrine, we find under the circumstances that the documents Chen was required to maintain by the BSA's recordkeeping requirements are properly subject to the Required Records Doctrine, and that Chen cannot assert a Fifth Amendment claim of privilege to resist their production.

IV.

Of course, obtaining enforcement of a summons starts with the government bearing the burden of making a prima facie showing as required by <u>United States</u> v. <u>Powell</u>, 379 U.S. 48, 57–58 (1964).[8]  "The IRS need only make a 'minimal' showing.  An affidavit of the investigating agent that the <u>Powell</u> requirements are satisfied is sufficient to make the prima facie case." <u>Sugarloaf Funding, LLC</u> v. <u>U.S. Dep't of the Treasury</u>, 584 F.3d

---

[8]     To obtain enforcement of a summons, "[t]he IRS must first make a prima facie showing '[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's possession, and [4] that the administrative steps required by the Code have been followed.'" <u>Sugarloaf Funding, LLC</u> v. <u>U.S. Dep't of the Treasury</u>, 584 F.3d 340, 345 (1st Cir. 2009) (alterations in original) (quoting <u>Powell</u>, 379 U.S. at 57–58).

340, 345 (1st Cir. 2009) (citation omitted). Additionally, the IRS may not issue a summons "with respect to any person if a Justice Department referral is in effect with respect to such person." 26 U.S.C. § 7602(d)(1). The government here submitted an affidavit executed by the IRS revenue agent stating that the summons was issued for the purpose of determining the 2008 tax liability of Chen and Ng, and that the IRS had not referred Chen or Ng to the Department of Justice for criminal prosecution. The agent acknowledged that the government had some documents pointing to the existence of Chen's foreign bank accounts, but not enough documents to know whether there was underpayment of taxes.

We reject Chen's argument that the government has not proven that he is in possession of offshore banking records, or that he even engages in offshore banking. At this stage, the government does not have to prove that Chen was in possession of documents subject to the BSA's recordkeeping requirements. Cf. In re Grand Jury Investigation M.H., 648 F.3d at 1071. The IRS need not "prove by positive evidence the existence of the records and their possession by the summonee." United States v. Lawn Builders of New Eng., Inc., 856 F.2d 388, 392 (1st Cir. 1988) (per curiam). Chen makes no serious argument that there are no such documents in his possession or that the government otherwise has access to the missing documents. Chen must produce the documents.

- 19 -

We also reject Chen's argument that "if the Court upholds the District Court's order compelling Chen to produce the records," we should impose "a use restriction on the testimonial communications inherent in the act of producing the records."

First, Chen did not request a use restriction in the district court, and so the request is waived for this proceeding. Second, the issue is hypothetical. We have no way of knowing if the records will even be put to prosecutorial use. The D.C. Circuit dealt with a similar issue in Office of Thrift Supervision, Department of the Treasury v. Dobbs, 931 F.2d 956 (D.C. Cir. 1991). There, the Office of Thrift Supervision ("OTS") had issued a subpoena duces tecum against Dobbs, requiring him to produce certain documents and appear for a deposition. Id. at 957. Dobbs challenged the subpoena, but the district court granted the OTS's petition to enforce it. Id. Dobbs then complied with the subpoena. Id. On appeal, Dobbs argued that "[e]ven though he [had] provided testimony to OTS, . . . [the] Court could grant relief from the subpoena by sealing the deposition record against future use." Id. at 958. The D.C. Circuit rejected his request because "Dobbs [was] seeking [the] Court's protection from future OTS action that may never occur." Id. The court cited "the well-established rule that questions of suppression should not be considered until the time when the Government seeks to use that

evidence." Id. (quoting United States v. Kis, 658 F.2d 526, 533 (7th Cir. 1981)). The same reasoning applies here.

VI.

Chen also appeals the district court's denial of his claim of privilege over his act of producing personal and corporate domestic financial records. The district court provided no explanation for why it denied Chen's claim or how it analyzed the claim. In its original order, the district court found that "Chen's Fifth Amendment privilege [was] engaged," and so it ordered "in camera review of the summonsed documents which do not fall within the scope of the recordkeeping requirements of the Bank Secrecy Act in order to determine, on a document-by-document basis, whether Chen's assertion of his Fifth Amendment privilege is made out." Chen, 952 F. Supp. 2d at 334. But after it reviewed the documents that Chen provided, the district court only issued a brief order stating: "The Court having carefully reviewed the documents submitted in camera and revisited the arguments and briefs heretofore filed, it concludes that there is no occasion to reconsider any of its prior orders. The IRS summons shall be enforced in accordance with its terms."

We have noted before that district courts "should take reasonable steps to ensure that the parties and the appellate courts will be able to glimpse the foundation on which their rulings rest," and that in some cases, "such statements are a

- 21 -

necessary precondition to intelligent appellate review." Grossman v. Berman, 241 F.3d 65, 68 (1st Cir. 2001).  When "faced with the task of reviewing an inscrutable order," we may either "remand for a fuller exposition or act, without remanding, if a reasonable basis supporting the order is made manifest on the record." United States v. Podolsky, 158 F.3d 12, 16 (1st Cir. 1998); see Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 77-78 (1st Cir. 2010).  Here, we vacate and remand to the district court for an explanation of its ruling.  If Chen wishes to challenge that order, he should file a new appeal.

## VII.

We affirm the district court's order compelling Chen's production of those documents required to be kept under the Bank Secrecy Act.  As to the district court's enforcement of the summons for documents not subject to the BSA, we vacate and remand to the district court for further proceedings consistent with this opinion.  No costs are awarded.